**UNITED STATES of America, Plaintiff,**

v.

**ARMCO STEEL CORPORATION, Dresser Industries, Inc., United States Steel Corporation, and the Youngstown Sheet and Tube Company, Defendants.**

**Crim. No. 35326.**

United States District Court
S. D. California,
Central Division.
March 4, 1966.

Draper W. Phillips, Dept. of Justice, Antitrust Div., John J. Schimmenti and Rudolph Pearl, Los Angeles, Cal., for plaintiff.

Breed, Abbott & Morgan, New York City, by Robert A. Bicks, David S. Patterson, Curtis W. Enyeart, New York City, and Flint & McKay, by John C. Argue, Los Angeles, Cal., for defendant Armco Steel Corp.

McCutchen, Black, Verleger & Shea, by Philip K. Verleger and Jack D. Fudge, Los Angeles, Cal., for defendant Dresser Industries, Inc.

Musick, Peeler & Garrett, by Jesse R. O'Malley, and Donald R. Gail, Los Angeles, Cal., for defendant United States Steel Corp.

Adams, Duque & Hazeltine, by Lawrence T. Lydick, Los Angeles, Cal., and J. F. Wagenhauser, Gen. Counsel, Continental-Emsco Co., Dallas, Tex., for defendant Youngstown Sheet & Tube Co.

HALL, District Judge:

There are two ultimate questions to be decided:

First: Whether or not jeopardy did attach to Count 2 in this case, that is, can the Government again file and prosecute to judgment the same indictment as is contained in Count 2 against the same defendants, except for those pleading nolo?

Second: If jeopardy did attach to Count 2, does it attach under the facts in this case as to Count 1, as every case must be decided on its own facts.

The resolution of these questions requires the examination and decision of several other questions, some not raised or argued by counsel. They are what I call "nagging questions," that when you attempt to approach the central question in the case these subsidiary questions keep nagging you.

And while I am conscious of the oft-repeated statement by the Supreme and other appellate courts that they will not examine or decide questions not raised in the court below, I am also conscious of the fact that now and then (and one never knows just when) such courts do consider matters which have not been raised in the court below because they are either "ripe for decision" or are "in the interest of justice," and they proceed to decide them even though they may only be peripheral or may only "lurk in the record," as Justice Frankfurter described them in one case.

So even though counsel, perceiving the law on such questions so much more clearly than I, did not raise or argue them I feel behoved to decide them.

The constitutional provision bears repeating. It says, "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb."

▮ I adhere to the opinion that I announced at the commencement of the argument, that double jeopardy is an absolute right, it is not modified such as searches and seizures by the word "unreasonable," it is not modified as the right of condemnation which must be for "public use," it is not subject to the elasticity of the phrase "due process of law" and other modifications of other rights, and under that clause, if a person is once placed in jeopardy for an offense he simply cannot be prosecuted for that offense again, regardless of the reasonable or unreasonableness or the public interest which may bespeak a prosecution.

▮ It is noted that constitutional jeopardy applies to "persons." Everybody here had assumed that "persons" included corporations, but in an examination of the Constitution I find no definition of "persons."

In the cases of United States v. General Electric, D.C., 40 F.Supp. 627, and United States v. Ozark Canners, 51 F. Supp. 150, corporations as well as individuals were indicted. Those cases involved motions concerned with whether or not the indictment stated only one offense But in neither of them nor in any of the other cases examined by the court, including those cited by the parties, has there been found any discussion as to whether or not the constitutional jeopardy extended to persons also included corporations.

It again is one of those kind of questions which nag for an answer and which may "lurk in the record" and may become "ripe for decision" when this case reaches the appellate court.

Sections 7 and 12 of Title 15, the antitrust law, both define "persons" as including corporations. Section 7 has specific reference to Section 1 under which the present indictment is brought so that under the antitrust law corporations are included as persons.

Section 1 of Title 1 of the United States Code does likewise when the question is, "determining the meaning of any act or resolution of Congress," and there are literally scores of similar statutory definitions contained in other acts of Congress to the same effect. I counted more than 120 references to the definition of "persons" in different statutes in the Code Index.

And while all of such definitions relate to acts of Congress—and there is no constitutional definition and no case that I can find that has discussed or decided the matter—nevertheless in view of the consistency of such congressional definitions and similar consistent holdings by the courts from the earliest times with relation to statutes and contracts, and in view of the fact that "persons" while they are not corporations, either directly or indirectly ultimately persons own all corporations and thus "persons" must ultimately suffer whatever penalties are imposed upon the corporations, it seems beyond doubt to me that the constitutional jeopardy extended to "persons" includes corporations, which each of the four remaining defendants is.

The punishment of Section 1 of Title 15 is that a violation thereof shall be a misdemeanor, and the punishment prescribed is a fine not exceeding $50,000 or by imprisonment not exceeding one year.

While the constitutional provisions speak of "jeopardy of life or limb," (and corporations have neither lives nor limbs) and while we have no punishment prescribed which permits the sacrifice of any limbs, and there are only two crimes which permit the taking of one's life as punishment, nevertheless here again is another question which "lurks in the record" because the common law jeopardy extended only to felonies.

But that matter was settled by the Supreme Court in 1873 in Ex parte Lange, 18 Wall. 163, 21 L.Ed. 872, where the court held that pleas of once in jeopardy are now valid in felonies, minor crimes and misdemeanors alike.

In one of the contentions of the Government it premises, that inasmuch as the court held the bill of particulars insufficient, such insufficiency invalidated the indictment and that jeopardy cannot attach on an invalid indictment.

This contention must find support in the proposition that the Government can file an indictment which states an offense and is in all respects otherwise valid on its face but that by failing or refusing, whether given one or five opportunities to respond to lawful orders for bills of particulars, in the language of Ball v. United States, decided in 1896, 163 U.S. 662, at 667, 16 S.Ct. 1192, at 1194, 41 L.Ed. 300:

> ."* * * presents the novel and unheard of spectacle of a public officer, whose business it was to frame a correct bill, openly alleging his own inaccuracy or neglect as a reason for a second trial, when it was not pretended that the merits were not fairly in issue on the first."

The Government's position in this respect is so repugnant too and at

variance with any concept of the criminal law to which I have been exposed in 50 years at the bar that it should be rejected out of hand. And this is further so because I think it may be said that it is universally held that the validity and sufficiency of an indictment must be determined from the face of the indictment alone.

But in view of what I said at the beginning concerning questions which may be "ripe for decision" or "lurk in the record" at some time I have felt impelled nevertheless to examine the question as to whether or not jeopardy does or does not attach upon an invalid indictment, although as indicated no one has raised that question in this case.

At the argument the court was of the opinion that the common law rule prevailed, which was that once in jeopardy could not attach if the indictment was invalid.

In that respect the court has made a further examination of the cases and finds that my holding and statement at that time was the generally accepted doctrine in the United States until the question was first presented to the Supreme Court in 1896 in United States v. Ball, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300, which held jeopardy could attach even on a defective indictment.

The case of Kepner v. United States (1904), 195 U.S. 100, at 130, 24 S.Ct. 797, 49 L.Ed. 114, affirmed that proposition as "settled law."

The holding in neither of these cases has been overruled by the Supreme Court, although a number of lower courts have stated there must be a valid indictment.

In the Ball case, Millard Ball, John Ball and Robert Boutwell were charged and tried for the murder of one Box. John Ball and Boutwell were convicted but Millard Ball was acquitted. Thereafter John Ball and Boutwell took an appeal to the Supreme Court of the United States, which they could then do, on the ground that the indictment was insufficient and the Supreme Court in Ball v. United States, 140 U.S. 118, 11 S.Ct. 761, 35 L.Ed. 377, so held and remanded the case with directions to quash the indictment.

Thereafter Millard Ball, John Ball and Boutwell were again indicted for murder, and all three were convicted; Millard Ball having objected to proceeding to trial on a plea of former jeopardy, which was overruled.

After the conviction of all three of them, Millard Ball took an appeal to the Supreme Court on his plea of former jeopardy. The court in that case, which is 163 U.S. 662, beginning at page 666, 16 S.Ct. 1192 reviewed the English cases and the English doctrine which had previously been followed in this country to the effect that former jeopardy could not be pleaded on an invalid indictment, but the court reached the conclusion (163 U.S. at page 669, 16 S.Ct. at page 1195) that:

"* * * although the indictment was fatally defective, yet, if the court had jurisdiction of the cause and of the party, its judgment is not void, but only voidable by writ of error, and, until so voided cannot be collaterally impeached. * * * If the judgment is upon an acquittal, the defendant, indeed, will not seek to have it reversed, and the government cannot. United States v. Sanges, 144 U.S. 310 [12 S.Ct. 609, 36 L.Ed. 445]. But the fact that the judgment of a court having jurisdiction of the case is practically final affords no reason for allowing its validity and conclusiveness to be impugned in another case.

"* * * Millard F. Ball's acquittal by the verdict of the jury could not be deprived of its legitimate effect by the subsequent reversal by this court of the judgment against the other defendants upon the writ of error sued out by them only."

On page 667, 16 S.Ct. on page 1194 the court, in adopting the dissenting opinion in People v. Barrett, 1 Johns 66, after commenting that in that case the defendants had not attempted to avail them-

selves of the imperfection of the indictment, said:

> "These defendants have availed themselves of no such imperfection, if any there were, nor has any judgment to that effect been pronounced. This case, in short, presents the novel and unheard of spectacle of a public officer, whose business it was to frame a correct bill, openly alleging his own inaccuracy or neglect as a reason for a second trial, when it is not pretended that the merits were not fairly in issue on the first. That a party shall be deprived of the benefit of an acquittal by a jury, on a suggestion of this kind, coming, too, from the officer who drew the indictment, seems not to comport with that universal and humane principle of criminal law 'that no man shall be brought into danger more than once for the same offense.' It is very like permitting a party to take advantage of his own wrong. If this practice be tolerated, when are trials of the accused to end?"

Incidentally, John Ball and Boutwell also took an appeal and also raised the plea of former jeopardy, but the Supreme Court held that inasmuch as by their affirmative action they had the previous indictment dismissed the plea of once in jeopardy was waived thereby and could not be sustained.

There are two sets of procedural facts involved in the decision here. The first set of procedural facts are those which are reflected in the docket and the pleadings, motions and papers filed in the case which led up to and culminated in the order of the court discharging the jury and dismissing Count 2 of the indictment.

It is unnecessary to recite all of them here.

The second set of facts include those procedural facts as well as the contents of the documents and files and records, particularly the indictment and the bills of particulars.

It is well to examine the general principles underlying the doctrine of once in

jeopardy in light of the first set of such procedural facts.

Constitutional jeopardy differs from the common law double jeopardy which required that there should be either a conviction or an acquittal (autrefois acquit or autrefois convict) by a court having jurisdiction on a valid indictment.

But that is no longer necessary as a person can be placed in jeopardy whether or not the trial goes to verdict or judgment when he is regularly charged with a crime before a tribunal competent to try him. Cornero v. United States (Ninth Circuit 1931), 48 F.2d 69; Downum v. United States (1963), 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100; which cited and quoted the Cornero case with approval; Foster v. United States (Tenth Circuit 1964), 339 F.2d 188, 190; Green v. United States (1957), 355 U.S. 184, 188, 78 S.Ct. 221, 2 L.Ed.2d 199.

All the parties have agreed, and the court holds, that the indictment states an offense and is valid.

The difficulty in applying the doctrine is ascertaining *when* jeopardy attaches. That is not only at what stage of the proceedings, but under what circumstances it attaches. This can perhaps best be determined by first disposing of the situations when it does not attach.

The Ninth Circuit in Himmelfarb v. United States (1949), 175 F.2d at 924, at pages 932 and 933, 70 S.Ct. 103, 94 L.Ed. 527, certiorari denied 338 U.S. 860, reviews extensively the instances where jeopardy does not attach.

Jeopardy does not attach when a jury has been sworn if there exists urgent circumstances or an emergency which by diligence and care could not have been averted, and, when it appears that a free and fair trial cannot be had, the court may discharge the jury even over the objection of the accused.

It does not attach where a jury cannot agree, or where a juror is found to have sworn falsely on voir dire, or where several jurors have read newspaper reports, or where a juror is dis-

covered to have served on a grand jury which found the indictment, or on a jury of a former trial of the same case, or where a juror or the court becomes ill, or incapacitated, or unavailable, or where the accused becomes ill or a member of a juror's family becomes ill or dies, or where it was discovered that a juror was prejudiced, or was related to the accused, or where a prisoner tampered with some of the jury, or where a prejudicial exclamation was uttered by the accused during jury view of the crime scene, or where an essential witness for the prosecution refuses to be sworn, having conscientious scruples against taking an oath, or if the court did not have jurisdiction of the offense.

But none of such instances or circumstances are present in this case.

■■ The right to double jeopardy is a right which can be waived. The act which constitutes a waiver must be such that it indicates the intentional relinquishment of a known right or privilege, as a strong presumption is raised against waiver of fundamental rights by an accused. Himmelfarb v. United States, supra, 175 F.2d at page 931; Johnson v. Zerbst (1938), 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461.

■■■ Such waiver need not be direct or express. Brady v. United States (Eighth Circuit 1928), 24 F.2d 397, certiorari denied 278 U.S. 603, 49 S.Ct. 10, 73 L.Ed. 531; Himmelfarb v. United States, supra, 175 F.2d page 931. But the waiver may be, and is, accomplished by affirmative action by a defendant when he procures a judgment against him to be reversed or set aside on appeal (United States v. Ball, 1896, 18 Wall. 662, at 671–672), or when the defendant consents to or procures the discharge of the jury as was done in Himmelfarb, supra, or procures the dismissal of the indictment for failure to state an offense.

Green v. United States (1957), 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199, differs from the Ball and Himmelfarb cases and others of like effect in that on the first trial in Green the jury had in effect acquitted Green of first degree murder, when it found him guilty of the lesser included offense of second degree murder. He was again charged after a reversal or dismissal with first degree murder.

In Bryant v. United States (Eighth Circuit 1914), 214 F. 51, at 53, the court commented that:

"The principle of such cases (of waiver) is that a sentence that has been vacated by the action of a prisoner cannot then be put up by him as an obstacle to the further administration of justice."

■■ There can be no hard and fast rule as each case must stand upon its facts, but as a general proposition it may be said that jeopardy does not attach when, as so well stated in United States v. Shoemaker, "the fault was not with the prosecuting attorney, nor with the defendant."

United States v. Shoemaker, 27 Fed. Cas. 1067, at 1068 (No. 16,279) C.C.Ill. 1840; Johnson v. Zerbst, 304 U.S. 458, at 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

■■ The general rule is that a person is not in jeopardy in a jury case until he has been arraigned, has pleaded, and a jury has been impaneled and sworn. McCarthy v. Zerbst (Tenth Circuit 1936), 85 F.2d 640; certiorari denied 299 U.S. 610, 57 S.Ct. 313, 81 L.Ed. 450.

Or stated affirmatively, jeopardy does attach after the accused has been arraigned, pleaded not guilty, a jury sworn and in the box even though no evidence may be presented, if the defendant does not consent to the discharge of the jury or the dismissal.

It is unnecessary to discuss this proposition other than to cite some of the cases where it is so well stated, particularly United States v. Shoemaker, 27 Fed.Cas. 1067; United States ex rel. Rush v. Watson, 28 Fed.Cas. 499; Cornero v. United States, 48 F.2d 69; Downum v. United States (1963), 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100.

I hold that jeopardy did attach in this case as to Count 2 if the defendants did not waive it, to which question I now come.

■ The Government contends jeopardy does not apply in this case because the defendants waived jeopardy in that they took an affirmative act to bring about the discharge of the jury and the dismissal of Count 2. The Government appears to assert in this respect that the defendants having made a motion to dismiss prior to trial, which was denied, that their renewal of the motion to quash and the objection to the introduction of testimony was in fact a continuation of the motion to dismiss, although there was no statement either orally or written that there was a renewal of the motion to dismiss in either the motion to quash or the objection to the introduction of testimony.

I fail to perceive the reason or logic in this contention, and hold that such is not the case.

When the motion to dismiss prior to trial was denied, that was the end of the matter. Thereafter the defendants never renewed that motion but made a motion to quash the evidence on the ground the Government had failed to comply with the orders of the court with relation to the bills of particulars, and thus prejudiced the rights of the defendants.

That motion was argued and I indicated with perhaps more elaboration than necessary, but which need not be repeated here, that I would make a ruling at what I considered to be the proper procedural time, namely, after the jury was in the box and the first witness was sworn and upon the objection of the defendants to the introduction of any testimony on the grounds assigned and argued in the motion to quash the evidence.

Accordingly the jury was returned to the box, the witness was sworn, a question was asked, the objection was made, and the court sustained it for the reasons theretofore announced and discharged the jury and dismissed Count 2.

The Government was then in the position where it could not present any evidence and the defendants would then have been entitled to have made a motion for a judgment of acquittal under the Federal Rules of Criminal Procedure, Rule 29, on the ground that the evidence was insufficient to sustain a conviction of the offense. No evidence having been admitted at all and the Government not being entitled to produce any evidence at all, certainly the evidence was insufficient.

However, the court chose to proceed under Rule 48(b), which permits dismissal by the court for unnecessary delay on the part of the prosecutor.

Incidentally, in the earlier cases the Federal Rules of Criminal Procedure were not in force and effect and Rule 12 of the Federal Rules of Criminal Procedure abolishes all pleas except guilty or not guilty and nolo contendere and provides that all other matters shall be raised by a motion to dismiss.

■ The five opportunities given to the Government which resulted only in inadequate responses to the orders for the production of bills of particulars stretched from November 15, 1965 to January 31, 1966, with the trial continued from January 3, 1966 to January 31, 1966. Certainly that constitutes in my judgment an unnecessary delay, particularly in view of the five opportunities to have responded adequately to the motions and orders for a bill of particulars.

So the question to be resolved is whether or not the action which was taken by the court to discharge the jury and to dismiss Count 2 is sufficient to attach jeopardy.

In United States v. Shoemaker, 27 Fed. Cas., page 1067, after the jury was impaneled and witnesses sworn, the prosecutor abandoned prosecution and entered nolle prosequi on the indictment. The court stated the question to be resolved was whether or not such an abandonment amounts to an acquittal of the defendant.

The court, after reviewing the circumstances and occasions where consent of

the defendant was either express or implied, stated that the general rule was that such consent would be either express or implied where the fault was not with the prosecuting attorney or with the defendant, but held that inasmuch as the prosecution was abandoned by the United States, there was nothing left for the jury to try "and they were consequently, dismissed, * * * and from the record it would seem probable that the prosecution was abandoned, because of the insufficiency of the evidence to sustain it."

Here in this case certainly the evidence was insufficient to sustain the charge of the indictment because the prosecution could produce no evidence at all. In the Shoemaker case the court held that the discharge of a jury once sworn was in effect an acquittal in a criminal case even though the formal discontinuance took the form of a dismissal, and even though there was actually no dismissal.

In United States ex rel. Rush v. Watson, 28 Fed.Cas., page 499, the case was postponed several times and finally a juror was withdrawn because of the illness of the district attorney and the absence of witnesses. Upon the effort to retry the case the court sustained the plea of double jeopardy and pointed out that while there was no judgment of acquittal that:

"To hold now that the record of the proceedings of the court on the former trial amounts to a verdict of acquittal, is to do just what the court would have done at that time on the facts stated in the record. * * * But the weight of all the authorities on the subject is, that the position of this case, as it stood when the juror was withdrawn, entitled the defendants, in the absence of their express consent to any other course, to a verdict of acquittal, and therefore entitled them to the action of the court, at this time, on their application to the same effect. An order will, therefore, be entered, declaring that the proceedings on the former trial are held to be equivalent to a verdict of not guilty,

and discharging the defendants and their bail from further liability in respect of the indictment."

In Cornero v. United States (Ninth Circuit 1931), 48 F.2d 69, after the jury was impaneled and subsequently discharged because the district attorney's witnesses were not present, the case was again called for trial. The defendants raised the plea of former jeopardy, which was overruled by the trial court but sustained by the appellate court. While there was no formal order of dismissal but only a discharge of the first jury in the case, the appellate court nevertheless held that the proceedings were "equivalent to an acquittal as far as another trial upon the same charge is concerned."

In Woodring v. United States (Eighth Circuit 1963), 311 F.2d 417, certiorari denied 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414, Count 6 of an indictment was dismissed by the court at the conclusion of the evidence without stating that it was a judgment of acquittal. The court held that it was perfectly obvious that the reason the court dismissed it was because the testimony offered by the Government failed to substantiate the charge of Count 6 and that obviously the dismissal was with prejudice, which placed the defendant in jeopardy against another charge for the same crime alleged in Count 6.

This court now in this case concludes that it is of no moment that the jury was discharged and the case dismissed rather than that a judgment of acquittal was entered, and further holds that the effect of the dismissal was the same as a judgment of acquittal. It is a procedural technicality which should not weigh against the rights of defendants in criminal cases.

I hold that the discharge of the jury in this case and the dismissal of Count 2 was in effect a judgment of acquittal, that jeopardy did attach to Count 2, and that the defendants did not waive it.

That is to say, the Government cannot again charge the defendants with

violation of Section 1 of the Sherman Act as charged in Count 2, whether such indictment be in identical or different language than was contained in Count 2.

I come now to the critical and ultimate question to be decided here: Does the jeopardy which attached to Count 2 also attach to Count 1?

This concerns what I have adverted to as the second set of facts, that is to say, it includes all the procedural facts involved as to Count 2, and in addition the contents of the various pleadings, motions, responses, orders and other documents contained in the file, particularly the indictment, the bills of particulars, and the lists of alleged co-conspirators.

I will advert to various facts as they occur in the course of my remarks.

The indictment was returned September 25, 1965. It was in two counts. Both counts charged a conspiracy in violation of Section 1 of the Sherman Act. Under the heading "Offenses Charged" in Count 1 are paragraphs 6, 7 and 8, but of these paragraph 6 by itself states the offense under the Act, and paragraphs 7 and 8 are merely particulars concerning that offense, or as some cases refer to them they are "means of effectuating" or "objects of the conspiracy."

Paragraph 15 by itself of Count 2 states the offense and paragraphs 16 and 17 merely state particulars concerning the offense. They are other and different particulars than stated in paragraphs 7 and 8.

The charging paragraphs in Counts 1 and 2, that is, paragraphs 6 and 15, are in identical language except for two words.

Now while everybody here has probably read that paragraph many, many times the matter deserves to be read again at this time. It is short.

"6. Beginning at least as early as April 1960 (paragraph 15, Count 2, November 1963), the exact date being unknown to the grand jurors, and continuing thereafter up to and including the return of this indictment, the defendants and co-conspirators have engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce in subsurface pumps and subsurface pump parts in violation of Section 1 of the Act of Congress of July 2, 1890, as amended (15 USC Section 1, commonly known as the Sherman Act)."

■■■ All parties agree that it is the settled law that an indictment under Section 1 of the Sherman Act need not have any overt acts alleged or proved because the agreement, combination, confederation or the conspiracy itself, without more, constitutes the entire offense.

■■ Counsel for both sides conceded in argument, and the court holds, that the above quoted paragraph 6 as to Count 1 and paragraph 15 as to Count 2, without the addition of the additional paragraphs 7 and 8 in Count 1 and 16 and 17 in Count 2 were sufficient to state an offense under Section 1 of the Sherman Act.

■■ The decision of the critical question thus turns on whether or not essentially the same crime was charged in Count 1 as in Count 2.

The same "unreasonable restraint" of the same "interstate trade and commerce" in the same "subsurface pumps and pump parts" is charged against a conspiracy consisting of practically the same companies and individuals.

Count 2 charges eleven as defendants, seven of whom are charged in Count 1. The bill of particulars states that the conspiracy as to Count 2 consisted of the eleven who were indicted as defendants, plus 41 unindicted individual co-conspirators, 29 of whom are named in Count 1, and three unindicted alleged corporate co-conspirators, all of whom are named in Count 1. A total of 55 individual and corporate co-conspirators are alleged in the bill of particulars in Count 2.

The bill of particulars as to Count 1 charges seven defendants as conspirators, 38 unindicted individual co-conspirators, and three unindicted corporate co-con-

spirators (which are named in Count 2), for a total of 48 conspirators in Count 1, 39 of whom are alleged as co-conspirators in Count 2, either as defendants or unindicted.

In view of the fact that 39 of the same co-conspirators are alleged in Count 1 as are alleged in Count 2, and in view of the positions with the different defendants and co-conspirators which they hold, or held, and in view of the periods of time they are alleged to have participated in the conspiracy, as set forth in the Government's response to Demand 2(d), and in view of the identity of restraint, identity of commerce and identity of product, the court can only conclude that if there is any difference in the conspiracies it must be found in something other than the above-mentioned.

In argument the Government relied heavily upon statements made by defense counsel at the time of the argument on the motion for severance. At that time the only thing that was before the court or counsel was the indictment. The defendants contended—and of course the defendants knew at that time also what records the Government had of theirs, which were very great in number—and the court then held that on the face of the indictment two conspiracies were alleged, and granted the motion to sever on that basis, and that to permit them to be tried together would be prejudicial to the rights of the defendants.

But the situation has changed since then. The matter must be considered in the light of the five documents which the Government filed as bills of particulars, and their contents, and in light of the statements made throughout the arguments by Government counsel concerning their ability to prove the cases, and particularly with reference to one statement that the Government could have only charged one conspiracy, and in light of the alleged co-conspirators which at the time of the severance were not disclosed; nor were the alleged meetings, if there were meetings, and other particulars now before the court but then undisclosed. The court adopts as its view the views expressed by Mr. Bicks in argument in response to the Government's contention that the defendants conceded that two separate and distinct conspiracies are involved.

It is contended by the Government that the test for determining whether one or more offenses are involved in a given situation is whether identical evidence will support each of them. But the matter is not quite that simple in a case under Section 1 of the Sherman Act wherein the conspiracy itself is the offense and no substantive acts constitute a crime and no overt acts need be either alleged or proved.

No case under the Sherman Act is cited by the Government in support of this contention. Two cases by the Supreme Court are worthy of special consideration: Braverman v. United States (1942), 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23, and the American Medical Association v. United States (1943), 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434, the latter arising under the Sherman Act.

I have examined all of the cases cited by the Government and none of them is applicable here for the reasons set forth by defense counsel in argument, which I need not repeat except to mention that in each of them which concern conspiracy there is either involved the general conspiracy statute which required overt acts, together with a statute which prescribed substantive offenses, or the different counts of the indictment were based on different statutes proscribing different crimes.

Quite unlike the case here, where the conspiracy itself is the offense and, as noted, without any substantive offense or overt acts being necessary for allegation or proof.

While the court affirmed the conviction of the defendants in American Medical Association v. United States (1943), 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434, it nevertheless laid down what I consider to be an excellent guide for deter-

mining whether or not an indictment charges one or more conspiracies.

The defendants in that case contended that the indictment charged five conspiracies defined by their separate and reported purposes and objects, and they contended they were entitled to have a verdict on each of the five, or a ruling of the court on each of what they contended were five separate conspiracies, even though only one conspiracy was alleged.

The court held the indictment did not state five conspiracies but only one and said, among other things:

> "If in fact the indictment charges a single conspiracy to obstruct and restrain the business of Group Health, and if the recited purposes are really only subsidiary to that main purpose or aim, or merely different steps toward the accomplishment of that single end, and if the cause was submitted to the jury on this theory, these contentions fail."

In Braverman v. United States (1942), 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23, the defendant was convicted on seven counts. Each count charged a separate conspiracy to violate a separate and distinct Internal Revenue law of the United States.

The court held that a single agreement to commit an offense does not become several conspiracies because it continues over a period of time and that it was improper to charge and find the defendants guilty where each of the counts of an indictment alleges a conspiracy to violate a different penal statute, and stated:

> "Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one."

The case of Burton v. United States (1906), 202 U.S. 344, 26 S.Ct. 688, 50 L.Ed. 1057, cited and relied upon by the Government, does not hold that the evidence must be identical to have identity of offenses, but it does hold that the offenses are not identical when the two charges are so diverse as to preclude the same evidence from sustaining both.

If the evidence to sustain Count 1 and the evidence to sustain Count 2 are "so diverse" as to preclude the evidence on Count 2 from sustaining the evidence on Count 1, Government counsel has failed to make it clear to me because whatever evidence is required to sustain the charge in Count 1 for the period from 1963 to 1965 would of necessity from the bills of particulars and the language of paragraph 15 of Count 2 and paragraph 6 of Count 1 be the same evidence as that needed to sustain the conspiracy for that period of time in both Count 1 and Count 2.

In United States v. General Electric Company, D.C., 40 F.Supp. 627, the court stated that one of the tests would be whether or not the only difference between two counts appear to be the stress or emphasis which is placed on a particular phase, result or objective of the single conspiracy in restraint of interstate and foreign commerce. In Count 1 of that case the emphasis was on the price-fixing phase or objective, and in Count 2 it was on the limitation of imports and exports. Both were laid under Section 1 of the Sherman Act.

The court also emphasized that the difference between the two counts was merely that each set forth a different means of effecting the original conspiracy.

In that case the original charge was of a conspiracy by an agreement in 1928 and an attempt to allege a second conspiracy when that agreement was "amended," or changed in 1936. The court was of the opinion that there was but one conspiracy charged, although it held that the Government should not be required on the motion then before the court to elect in advance of trial on which count it intended to proceed.

But had that case been postured as this one is now, from the reasoning set forth by the court, it would have been compelled to dismiss the indictment as it held that the change made in 1936 merely increased the scope of the conspiracy from a national one to a world-wide one.

In other words, the greater, even though later in purpose, included the lesser.

So here how can it be said, with the identities of the charges heretofore mentioned which are contained in paragraphs 6 and 15 of the indictment, that the greater conspiracy to obstruct the commerce of the United States as charged in Count 2 did not include the lesser conspiracy to do the identical things in the lesser area, namely, California, for three-fifths of the same period of time?

The single conspiracy is the crime, and it matters not how many subsidiary objects of a conspiracy there may be. As noted from reading paragraphs 6 and 15 of the indictment, the indictment was identical as to scope and object. It overlapped as to date for two of the five years between 1960 and 1965.

In United States v. Ozark Canneries Association (1943), D.C., 51 F.Supp. 150, the court held that an indictment under Section 1 of the Sherman Act stated only one conspiracy even though there was a plurality of objects.

In United States v. Cohen (Third Circuit 1952), 197 F.2d 26, the court held that a single conspiracy cannot be split up for the purpose of prosecution, and a smaller conspiracy in point of number of defendants and period of time involved cannot be carved out of a larger conspiracy.

Cosgrove v. United States (Ninth Circuit 1955), 224 F.2d 146, is to the same effect.

It is unnecessary to review the other cases cited and those examined which were not cited which support the position of the defendants in this respect.

Paragraph 6 of Count 1, having stated a complete offense under Section 1 of the Sherman Act, paragraphs 7 and 8 of Count 1 become no more than an allegation of means to effect a conspiracy and to show purposes which are subsidiary to the main purpose and aim of the alleged conspiracy set forth in paragraph 6.

The same is true of paragraphs 16 and 17 as to Count 2 with relation to the conspiracy set forth in paragraph 15.

Neither paragraphs 7 nor 8, nor 16 nor 17 add anything which is necessary to the indictment.

Without further analysis of either the cases, or the indictment, or the bills of particulars, or statements of counsel in previous arguments, the court concludes that there is no substantial difference between the conspiracy charged in Count 1 and that charged in Count 2. They are essentially the same. The evidence necessary to sustain the continuation of the conspiracy as charged in Count 1 from 1963 to 1965 is the same evidence that would be necessary to sustain the conspiracy as charged in Count 2, all as disclosed by the bills of particulars and by statement of Government counsel in argument at different times.

At the outset of the argument on February 25th I announced to counsel that it would be unnecessary for them to argue the matter of collateral estoppel because of res judicata, and counsel for neither side touched on the matter of collateral estoppel.

It seemed to me then that the doctrine of res judicata of necessity required that there should be a judgment, a judicial conclusion on the merits, and inasmuch as there was a dismissal as to Count 2 I did not think the doctrine of res judicata would apply.

However, I have studied the matter since and, as heretofore indicated, have come to the conclusion that the dismissal was equivalent to and had the effect of being a judgment of acquittal for insufficiency of the evidence.

That being so, there was a judgment in the case which would and does bring into play the doctrine of res judicata,

378

and I hold on the basis of authorities heretofore mentioned that because the effect of the dismissal was the same as a judgment of acquittal the doctrine of res judicata applies and that the Government is precluded from further proceeding against the defendants on Count 1 on the ground of collateral estoppel because of res judicata, in addition to being precluded from proceeding on the ground that it would put the defendants in double jeopardy.

The motion of the defendants is granted and the case is dismissed.