**UNITED STATES of America,
Plaintiff,**

v.

**AMERICAN HONDA MOTOR COMPA-
NY, Inc., Chicago Area Honda Dealers'
Association, Tom Cates, Robert R.
Shaw, James Lee, Gale T. Johnson, and
Basil Proskin, Defendants.**

No. 66 Cr 574.

United States District Court
N. D. Illinois, E. D.

Sept. 18, 1967.

Edward V. Hanrahan, U. S. Atty., John E. Sarbaugh, Thomas S. Howard, Joseph E. Paige, Patricia M. Lines, Dept. of Justice, Antitrust Div., Chicago, Ill., for plaintiff.

John H. Bickley, Jr., Chicago, Ill., Roland N. Smoot, Lyon & Lyon, Los Angeles, Cal., for defendants.

## MEMORANDUM OPINION

WILL, District Judge.

Defendant American Honda Motor Company, Inc.[1] on November 8, 1966, moved to dismiss the instant indictment, 66 CR 574, returned September 12, 1966. The motion is predicated on the defenses of former jeopardy, and denial of due process, in violation of the Fifth Amendment. These defenses are based upon its plea of *nolo contendere* on March 20,

---

1. Hereinafter referred to as American Honda or simply Honda.

1966, and payment of a fine of $10,000, imposed June 10, 1966, under an indictment, No. 35909, returned March 15, 1966, in the Southern District of California, charging a conspiracy in the Greater Los Angeles area. The remaining defendants [2] filed a joint motion to dismiss March 3, 1967, urging similar grounds to those of Honda.

The instant indictment charges a conspiracy to violate Section 1 [3] of the Sherman Act in the Chicago area. There have also been indictments in the Northern District of California (returned August 3, 1966, No. 40956) charging a conspiracy in the San Francisco area, and one (No. 8890) in the Southern District of Ohio, alleging a similar conspiracy in the Ohio area. It is also intimated that 22 or more additional similar indictments could be brought [4] and 1,500 indictments are possible, that being the total number of Honda dealers in the United States. The Government, however, states it has advised defendants' counsel that no further indictments are contemplated.[5] No explanation is given by the Government why only four indictments will be sought

if there were substantial additional local conspiracies as it contends.

In general, it is Honda's position that there was, if any, but a *single* national conspiracy, and therefore there can be but one indictable crime. Since it has already paid the maximum penalty, no further fine may be imposed and the ban against double jeopardy is here applicable. The claim of denial of due process is predicated on unreasonable discrimination, harassment, economic hardship and excessive punishment. Defendant Honda has supported its position with careful and extensive affidavits and briefs. The gist of its position is that it was merely trying to establish a national fair trade practice and that Section 1 of the Sherman Act proscribes an illegal course of conduct, not *segments* thereof.

It is the Government's position that double jeopardy does not obtain in this case because it is charging four *separate,* local conspiracies, each involving different defendants (with the exception of Honda), residing in different geographical areas, and each covering varying

2. Chicago Area Honda Dealers' Association, Tom Cates, Robert R. Shaw, James Lee, Gale T. Johnson and Basil Proskin.

3. 15 U.S.C. § 1.

4. A total of 33 local Honda dealer associations throughout the United States were set up under the tutelage and advice of Honda national and district sales representatives.

5. No. 35909, in the Southern District of California, charged defendants American Honda, Honda Dealers Association of Southern California, John C. McCormack, Kiyohiko Okumoto, Paul J. Collins, Stephen A. Fordyce, William A. Krause, and Charles E. Schott with conspiracy in the Greater Los Angeles area, for the period of January, 1962, to sometime in 1965, to violate § 1 of the Sherman Act in that area, to fix, maintain and stabilize retail prices of Honda cycles and accessories and that they did acts to secure adherence to retail prices which had the effect of fixing prices at arbitrary and noncompetitive levels, thereby suppressing competition in the Los Angeles area.

No. 8890, in the Southern District of Ohio, returned November 22, 1966, charges American Honda, the Ohio Honda Dealers Association, Inc., Axelband and Brown and Associates, Inc., Russell E. March and Richard L. Klamfoth with conspiracy to violate § 1, in the State of Ohio, in the period of April, 1964, to sometime in 1965, with similar violations as to the State of Ohio.

No. 40956, in the Northern District of California, returned August 3, 1966, against American Honda, the Bay Area Honda Dealers Assn., Joseph A. Quaid, T. C. Browne, Clifford G. Schmillen, Gary Jones, Charles N. Miller, Garve L. Nelson, Edward J. Correa, charging § 1 conspiracy in the San Francisco area for the period of August, 1961, to sometime in 1965, with similar allegations as to means of violation.

No. 66 CR 574, returned September 12, 1966, in the Northern District of Illinois, against American Honda, the Chicago Area Honda Dealers' Association. Tom Cates, Robert R. Shaw, James Lee, Gale T. Johnson, and Basil Proskin, with a § 1 violation, by conspiracy in the Chicago area.

periods of time. Each conspiracy, the Government asserts, is provable by different evidence. The only common point is the defendant American Honda. The Government denies that Honda's action was of a fair trade nature and nationwide in scope, on the ground that there were only "suggested" retail prices with no *binding* agreements by dealers to adhere to a prescribed price.

Honda's motion to dismiss is predicated on its being placed in jeopardy of conviction four or more times, whereas, it urges, Section 1 permits but one sentence for a course of conduct. Further, it asserts that it has been denied due process by the Government's failure to seek an indictment in Los Angeles against it for all its activities although the Government was then in possession of all the information necessary to obtain such an indictment. It charges that the Government seeks to harass it and impose increased punishment upon it beyond the statutory sanction, and arbitrarily and unreasonably to discriminate against Honda. The similarity in subpoenas issued originally in Los Angeles and subsequently in other cities, is evidence, Honda contends, of harassment.

The joint motion of all remaining defendants to dismiss, filed March 3, 1967, asserts (1) a denial of due process under the Fifth Amendment as outlined in Honda's earlier motion to dismiss; (2) that the Government failed to seek indictments against the remaining defendants, other than Honda, in the Los Angeles case, although it could legally have done so; (3) that the indictments were prompted to harass the defendants; (4) that it is an abuse of governmental discretion to prosecute them for a conspiracy allegedly dominated by Honda, whom the Government is constitutionally precluded from prosecuting; (5) that the defendants have engaged in no conspiracy because they did only what was legally required of them by Honda under its Fair Trade program, and (6) that defendant Cates, an employee of Honda, may not be prosecuted herein because the constitutional prohibition against

prosecuting Honda applies as well to him, and because his activities as a mere corporate employee may not be made the basis of an indictment under Section 1 of the Sherman Act.

They further urge that it was Honda which suggested the formation of, and helped form, dealer associations, the primary purpose of which was joint advertising, but it also used the associations to receive dealers' comments, complaints, etc. Honda ceased its Fair Trade price maintenance program before the investigation which resulted in the instant indictment. If there was any conspiracy, they assert that the dominant force was Honda, and any conspiracy has long since been disbanded and the principal conspirator punished. The remaining defendants' activities did not constitute a conspiracy but were consonant with maintenance of the fair trade policy instituted by Honda (citing United States v. Arnold, Schwinn & Co., 237 F.Supp. 323 (N.D.Ill.1965), reversed June 12, 1967, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249).

Honda construes Section 1 of the Sherman Act to cover a "course of conduct" and not "each sub-part which may effectuate such conduct" and there may be only one punishment for such course of conduct. Ex Parte Snow, 120 U.S. 274, 7 S.Ct. 556, 30 L.Ed. 658 (1886); Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942). It insists that the evidence shows that all the alleged separate conspiracies were sub-parts of Honda's nation-wide price maintenance system and points out that the evidence sought and submitted by the Government to the Southern District of California grand jury was directed to its *nation-wide* activities, its dealers and dealers' associations, although the indictment was limited to that district. Honda contends that the use of multiple grand juries where all relevant evidence was available to the *first* grand jury is so oppressive it violates the due process guarantee. It accuses the Government of

improper motives, to harass and impose economic sanctions, which arbitrarily and unreasonably discriminate against Honda and its Japanese owners. It cites the Government's first subpoenas, nation-wide in scope, given on short notice, with which it complied, even furnishing documents not requested. It alleges subsequent arbitrary and burdensome demands on itself and dealers throughout the country for duplicates of documents theretofore subpoenaed. There are also charges by Honda of four months of harassment in connection with grand jury hearings throughout the country, giving witnesses short notice, then cancellation and rescheduling, and even duplicate appearances.

Honda argues that while the various indictments by "artful" wording attempt to limit the scope of the various conspiracies to specific localities, the pleadings and evidence demonstrate that the so-called local conspiracies were all subparts of a nation-wide system of price maintenance.

■ The parties disagree as to the interpretation to be given Section 1— Honda contending that it proscribes a "course of conduct" and the Government, that it covers *each* conspiracy. The court believes the latter interpretation to be the correct one in that the statute itself states "Every * * * conspiracy" is declared to be illegal. It goes on to state that "[e]very person who shall * * * engage in any * * * conspiracy * * * shall be punished." So the question resolves itself down to whether Honda was a participant in more than one conspiracy. The court concludes that Honda's position as to double jeopardy must be sustained because the record discloses that there was but *one* conspiracy, *nation-wide* in scope, between Honda and all its dealers and their dealer associations.

The evidence of the nation-wide aspect of the conspiracy lies in Honda's uniform and consistent action in the conduct of its business—the sending of similar price lists, with variations for freight, similar dealer's contracts, the same promoting of associations within the respective areas of sale, and the same activities by its district managers in supervising and maintaining the retail pricing structures. The numerous affidavits and exhibits reveal that Honda and its dealers in the United States participated in a nation-wide program to fix and maintain prices, regulate sales and service policies and generally to police the distribution of Honda products.

## PROCEDURAL ASPECTS

■■ Concerning procedural aspects of the pending motions, we note there is no special plea by which these defenses can be raised. The only pleas allowed under our procedure are "not guilty, guilty and *nolo contendere*." All other pleas, demurrers and motions to quash are abolished. Defenses and objections raised before trial, which heretofore could have been raised by any one or more of them, must be raised only by motion to dismiss or to grant appropriate relief as provided in the Federal Rules of Criminal Procedure. (See Rules 11–12.)

Rule 12(b) provides that any defense or objection which is capable of determination without the trial of the general issue may be raised before trial by motion and, further, that issues of fact on such motions shall be determined by the court with or without a jury or on affidavits or in such other manner as the court may direct unless jury trial is required under the Constitution or by any Act of Congress.

In United States v. H. E. Koontz Creamery, Inc., 232 F.Supp. 312 (D.Md. 1964), the court, citing Rule 12(b), carefully reviewed the procedure concerning a pre-trial double jeopardy motion like the one here involved. Rejecting a government contention that the double jeopardy issue (unless determinable as a matter of law), must be submitted to the jury along with the general issue, the court ordered a pre-trial evidentiary hearing without a jury at which testimony in addition to the record was received. See the outcome of this hearing

in the second *Koontz* case, 257 F.Supp. 295 (D.Md.1966).

■ This court is of the opinion that such procedure is proper under the rules and that the issues raised on the pending motions can be, and should be, separately determined prior to trial upon comparison of the various indictments and upon evidentiary affidavits such as have been filed by both Honda and the Government in this case.

## DOUBLE JEOPARDY—ONE OR SEVERAL CONSPIRACIES

The subject of double jeopardy and multiple penalty in criminal prosecutions under the Sherman Act has been considered in a number of cases which can be grouped according to the various situations in which the question arose.

In American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), Montrose Lumber Co. v. United States, 124 F.2d 573, 575 (10th Cir. 1941), and United States v. Shapiro, 103 F.2d 775 (2nd Cir. 1939), the question was whether convictions on multiple counts separately charging conspiracy to restrain commerce under Section 1, and conspiracy to monopolize and monopoly under Section 2, amounted to double jeopardy and multiple punishment for the same offense.

In United States v. Anderson, 101 F.2d 325 (7th Cir. 1939), and United States v. New York Great Atlantic & Pacific Tea Co., Inc., 137 F.2d 459 (5th Cir. 1943), the question was whether conviction of two or more defendants of conspiracy in violation of the Sherman Act should be reversed as prejudicial to some defendants because the alleged conspiracy amounted, not to a single, but to several different conspiracies with which some of the defendants had no connection. In these two cases, the courts, examining the factual record, concluded that the evidence showed, not separate conspiracies, but a single conspiracy.

In United States v. Armco Steel Corporation, 252 F.Supp. 364 (S.D.Cal. 1966), the Government had brought a two-count indictment, one charging defendants with a Sherman Act price-fixing conspiracy with respect to subsurface pumps and parts through the United States from 1963 to date of indictment and the other count charging seven of the same defendants with a similar conspiracy limited to California. The court, after granting a severance of the counts for trial, then dismissed the count charging nation-wide conspiracy upon hearing a witness. Certain of the common defendants then moved that the other count be dismissed as to them on ground of double jeopardy. The motion was granted by the court on the ground that "there is no substantial difference between the conspiracy charged in Count 1 and that charged in Count 2."

The only Sherman Act case in which the question was clearly presented, not in connection with a single prosecution but in connection with successive prosecutions, is United States v. H. E. Koontz Creamery, Inc., 257 F.Supp. 295 (D.Md. 1966), (the second *Koontz* case). In that case, the defendant had previously been punished by a fine on plea of *nolo contendere* to an indictment charging conspiracy to allocate its school milk contracts. Thereafter the defendant was indicted for conspiracy to fix prices at which its milk products could be sold to the regular retail and wholesale trade. Upon the evidence presented at a pre-trial hearing on motion to dismiss on the ground of double jeopardy, the court found that the purpose of defendant was to maintain price stability in the Baltimore market and that their actions with respect to the school milk contracts were designed to control certain aspects of distribution all of which were facets of an overall price structure and that the acts charged were part of the same conspiracy for which defendants had been previously convicted.

Non-Sherman Act cases, holding that convictions on an alleged single conspiracy should be reversed upon the ground that the evidence showed, not one, but several separate and distinct conspiracies have been cited by the Government, for example, Kotteakos v. United States, 328

U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), (conspiracy to violate the National Housing Act); Canella v. United States, 157 F.2d 470 (9th Cir. 1946), (conspiracy by an army officer with others to defraud the Government), and Rocha v. United States, 288 F.2d 545 (9th Cir. 1961), (conspiracy to violate the immigration laws).

In these cases, the court merely laid down the principle that "[t]hieves who dispose of their loot to a single receiver —a single 'fence'—do not by that fact alone become confederates: they may be, but it takes more than knowledge that he is a 'fence' to make them such", adding "[a]s the Government puts it, the pattern was 'that of separate spokes meeting in a common center' though, we may add without the rim of the wheel to enclose the spokes."

This court agrees with that principle as applied to those cases. On the other hand, non-Sherman Act cases, holding that on the evidence single conspiracies were shown, rather than multiple separate conspiracies as claimed, are cited by defendant Honda, for example, Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942), (conspiracy to violate provisions of the Internal Revenue laws); Lefco v. United States, 74 F.2d 66 (3rd Cir. 1934), (conspiracy to violate federal statutes prohibiting the use of the mails to further fraudulent schemes); Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), (conspiracy to violate the Emergency Price Control Act) distinguishing the Kotteakos case, supra, saying "Apart from the much larger number of agreements there involved, no two of those agreements were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from all others, although all were alike in having similar illegal objects."

▮▮ The cases cited, whatever conclusion may have been reached on the evidentiary record, demonstrate that the issue of a single conspiracy or separate conspiracies is one of fact and that the test is well and briefly reiterated in the second Koontz case (257 F.Supp. 295, 305), "If there be a common, continuing objective of the parties, there is a single offense, despite the existence of diverse ways and means used to accomplish it", citing Braverman v. United States, 317 U.S. 49, 52–54, 63 S.Ct. 99, 87 L.Ed. 23 (1942); Short v. United States, 91 F.2d 614, 617–618 (4th Cir. 1937); United States v. Swift, 188 F. 92 (D.C.Ill.1911).

▮ The question in the pending case, therefore, is whether the record presented by defendant American Honda is sufficient to meet its burden of establishing that it and the dealers in all the areas involved had a *common, continuing objective of fixing, maintaining and stabilizing the retail prices of the product in all areas on a virtually nation-wide scale.* If so, the conspiracy was one conspiracy —notwithstanding that the common objective was furthered in diverse ways by different co-conspirators in separate sections of the nation who may not have been in direct conspiratorial contact with one another.

If, on the other hand, the alleged co-conspirators with Honda in the several areas *did not share with Honda any such broad objective but merely and solely aimed to maintain retail prices in their own, respective areas of competition,* then, of course, the objective of American Honda (maintaining its prices nationally in all areas) would break down into several separate conspiracies according to the point or place at which the objectives of Honda coincided with the objectives of its dealers.

Contending that all of the four claimed separate conspiracies involve a common objective of both American Honda and all dealer co-conspirators, defendant Honda has presented affidavits tending to show that Honda dealers in each of the various competitive areas are concerned with the retail price structure in all other areas; that price cutting affects the ability of a dealer to maintain proper servicing of

the product and its parts and adequate advertising; that this in turn affects the reputation of the product; that purchasers of this kind of product are impressed by dealer ability to provide servicing in other areas; that dealers in all areas are concerned with discounting anywhere because discounting anywhere tends to start discounting in other areas; that news spreads through a variety of channels, including word-of-mouth, the mails, national magazines, etc.; that dealers in one area visit with dealers in other areas and read about other areas; that widespread price stability is strong inducement to prospective dealers; that, for example, the younger set in all areas looks to Los Angeles as the "pace setter" for this product; that discounting in any area also affects the trade-in value of the product as compiled for the trade Blue Book.

The American Honda affidavits are also to the effect that in 1960, when it began the distribution of Honda products in the United States, it was a Japanese-owned company lacking knowledge of the antitrust laws of the United States as related to so-called fair trade practices; that it acted upon the suggestion of its first sales manager to the effect that, according to accepted practice in the industry, it should require its dealers to abide by its suggested prices; that at no time thereafter until late 1964 did it have any doubts concerning the legality of its pricing policy; that only in 1964, when it was threatened with legal action by a former dealer, did it receive from its present legal counsel advice which led it to discontinue its so-called fair trade pricing policy and to notify all its personnel and dealers accordingly. That since December 4, 1964, it has been and now is its policy to make no suggestion concerning retail prices.

The Government, on the other hand, has presented affidavits tending to show that American Honda product price-fixing activities in Chicago originated among Chicago area dealers themselves; that American Honda representatives participated therein as advisors only;

that the various dealer associations did not meet with or directly contact one another; that price stabilization suggestions from American Honda to any of these dealer groups was always specifically addressed to the local dealer groups; that the price-fixing meetings and activities of Honda representatives and these local groups involved only the respective local areas; that dealers in one region were not concerned with what was going on price-wise in other areas; that the local dealer groups made some subsidiary price agreements among themselves and on their own concerning certain models, accessory prices and "give away" practices; that the local dealer groups sometimes rejected or modified suggestions from American Honda; that the local dealer groups continued price fixing after being notified by American Honda that as the result of a threatened private antitrust action against it by a Los Angeles dealer, it would no longer participate in price stabilization.

The Government affidavits also show that the antitrust investigation originated on the recommendation of the Los Angeles Field Office of the Antitrust Division; that the first grand jury presentation was in Los Angeles; that, although there was no indication at the time that price fixing extended beyond the Los Angeles area, the presentation did encompass, not only Los Angeles, but similar activities in other areas; that this was done because of the known nation-wide operations of American Honda; that the Los Angeles presentation confirmed price fixing in the Los Angeles area and also indicated "similar but distinct conspiracies" in other areas; that, although the evidence was complete as to Los Angeles it was incomplete as to the other areas since testimonial evidence came almost entirely from Los Angeles dealers and local American Honda representatives; that American Honda was notified prior to its *nolo contendere* plea in Los Angeles that further grand jury presentations would follow in the other areas; that American Honda was not required to resubmit documentary evi-

dence that had already been presented at Los Angeles; that all the co-conspirator defendants indicted in the three other areas are different as to each of those areas and also different from those indicted in Los Angeles.

Considered as a whole, the evidentiary record shows that the products in question were nationally advertised and nationally distributed by American Honda; that the objective of American Honda was to fix and maintain prices in all regions where its product was distributed; that dealers in the various regions received advertising material showing the suggested prices; that dealers in the various regions were told by regional managers of American Honda's nation-wide so-called fair trade attempt to stabilize prices of the products everywhere; that the formation of dealers' associations in the various regions was part of Honda's policy for furthering, not only national advertising, but national price maintenance; that dealers in each regional association were aware of similar dealer associations in other regions; that dealers and associations in one region at times communicated with one another regarding matters of common interest, including pricing structures; that the purpose of American Honda's pricing policy was to assure prestige of the product that it felt would be lost if discounting was practiced in any region and allowed to spread; that price maintenance was designed to assure, not only dealer profit, but also dealer ability to maintain a correspondingly high quality of servicing and advertising—all to maintain the prestige of the product; that this prestige maintained in this manner was an inducement to acceptance of dealerships in the various regions.

Given modern means of communication and transportation, it is unrealistic to conclude that dealers in one region were wholly unconcerned with the maintenance of prices in other regions and were concerned only with price maintenance by dealers in their own particular region. Moreover, the affidavits filed herein indicate the contrary. Although the degree of concern may have been greater as to price maintenance vis-a-vis discounting among dealers within a particular region, dealers in every region, nevertheless, had a stake in maintaining an overall national pricing policy which, if allowed to deteriorate into discounting in one region, would soon spread to invite discounting in other regions.

Although their concern with nationally maintained price maintenance may have been less urgent than with regional maintenance, it is difficult to conclude that local dealers and associations did not share with American Honda the objective of which the dealers in all regions were beneficiaries. To this extent and in this respect local dealers and regional associations shared a common objective with American Honda.

If there was such a sharing of a common objective, which local dealers and regional associations furthered by contributing their part, it would make no difference that dealers and associations came into the nation-wide conspiracy at different times and at different places, or that they did not personally know one another or all details of the conspiracy everywhere or that there were local variations—so long as they shared and participated as integral parts in American Honda's objective.

As stated in American Tobacco Co. v. United States, 147 F.2d 93 (6th Cir. 1944), the character and effect of a conspiracy are not to be judged by dismembering it and viewing it in its separate parts but by looking at it as a whole. It is the common design which is the essence of the conspiracy or combination and this may be made to appear when the parties steadily pursue the same object whether acting separately or together by common or different means but always leading to the same unlawful result.

So far as the issue of single conspiracy vis-a-vis separate conspiracies is concerned, the factual situation shown by the record is not essentially different than in United States v. Anderson, 101 F.2d 325 (7th Cir. 1939); United States

v. Armco Steel Corporation, 252 F.Supp. 364 (S.D.Cal.1966); United States v. New York Great Atlantic & Pacific Tea Co., 137 F.2d 459 (5th Cir. 1943); United States v. H. E. Koontz Creamery, Inc., 257 F.Supp. 295 (D.Md. 1966); Lefco v. United States, 74 F.2d 66 (3rd Cir. 1934). See also United States v. General Electric Co., 40 F.Supp. 627 (S.D. N.Y.1941).

On the other hand, we believe the factual situation here is clearly distinguishable from those in *Kotteakos, Canella* and *Rocha,* supra.

■ We conclude therefore that Honda, having been prosecuted and convicted for violating Section 1 of the Sherman Act in the Los Angeles proceedings, may not again be charged in Chicago with a Section 1 violation for activities which were part of a single national conspiracy to maintain prices of its products throughout the United States and which were part of the same national conspiracy involved in the Los Angeles case. The prohibition of the Fifth Amendment against double jeopardy cannot be evaded by fragmentation.

## DUE PROCESS—HARASSMENT

■ Defendant American Honda further contends, and we think properly, that entirely apart from the double jeopardy provision of the Fifth Amendment, successive Grand Jury inquiries and indictments for alleged separate conspiracies arising out of the same transactions may, and in this situation do, constitute harassment in violation of the due process provision of the Fifth Amendment which provision, as explained by Justice Frankfurter in Joint Anti-Fascist Refugee Committee v. McGrath, Attorney General, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), is essentially a recognition of the requirement of fundamental fairness and fair play under a given set of circumstances.

Indeed, the Government, itself, has recognized that its policy should be and is "that several offenses arising out of a single transaction should be alleged and tried together and should not be made the basis of multiple prosecutions, a policy dictated by considerations of fairness to defendants and of efficient and orderly law enforcement." Petite v. United States, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960) (Solicitor General's Statement on motion to remand an appeal). (See also Marakar v. United States, 370 U.S. 723, 82 S.Ct. 1573, 8 L.Ed.2d 803 (1962)) The basic unfairness of any other policy has been considered and recognized in In re National Window Glass Workers, 287 F. 219 (N.D. Ohio 1922).

The wisdom of this interpretation and concept is demonstrated by the instant case. Subpoenas calling for large quantities of documents were issued in the original Los Angeles Grand Jury investigation. Included were documents of the dealers' associations in San Francisco, Chicago and Columbus, as well as all other dealer associations throughout the United States (a total of 33). More than 6,000 pages of documents from all over the country were produced in Los Angeles for consideration by the Grand Jury. Initially, witnesses from various parts of the country were subpoenaed to appear in Los Angeles though many of such subpoenas were subsequently cancelled after it was determined to limit the Los Angeles indictment to that area.

■ Shortly after the initial indictment was returned in Los Angeles, subpoenas were issued in San Francisco, which were substantially identical with those previously issued in Los Angeles, requiring the production again of virtually all of the San Francisco documents already produced in Los Angeles. Similar patterns of conduct followed in Columbus and Chicago. Except that the Department of Justice has apparently determined not to prosecute in other areas in which Honda dealer associations were organized and attempted to fix prices at the national scale, there is no

reason why Honda would not face further repetition of the subpoena process over and over again.

This is precisely the sort of harassment which fundamental fairness and the due process clause prohibit. The Government is not a ringmaster for whom individuals and corporations must jump through a hoop at their own expense each time it commands.

So far as American Honda is concerned, the motion to dismiss the pending indictment is granted.

### OTHER DEFENDANTS

■ We come then to the motions to dismiss of the individual defendants, none of whom was a defendant in the Los Angeles case. Accordingly, no question of double jeopardy as such can arise. Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938); Haddad v. United States, 349 F.2d 511 (9th Cir. 1965). Nor does the due process-harassment question arise as to them since they were not subpoenaed in any other case and have not been put to any expense except that involved in defending the charges against them in Chicago which will be more convenient than if they had been indicted in Los Angeles.

■ With respect to the contention that they were simply following Honda's directions and instructions, if this constitutes a defense to the indictment, the question as to the nature and extent of their participation in the conspiracy is a question of fact to be determined at the trial. Whereas the affidavits before the court demonstrate clearly the national conspiracy with Honda as its central figure, they do not suffice to establish the exact role of each individual defendant (United States v. H. E. Koontz Creamery, Inc., 257 F.Supp. 295 (D.Md.1966)) (Second Case).

Accordingly, the motions to dismiss of the defendants other than American Honda are denied. Appropriate orders will enter.