**UNITED STATES of America**

v.

**The H. E. KOONTZ CREAMERY, INC., et al.**

**Crim. No. 26128.**

United States District Court
D. Maryland.

July 22, 1966.

Edna Lingreen, Sinclair Gearing, Leonard Henzke, Jr., Milton A. Kallis and Margaret H. Brass, Attys., Dept. of Justice, Washington, D. C., Thomas J. Kenney, U. S. Atty. for Dist. of Maryland, for the Government.

M. William Adelson, Baltimore, Md., for The H. E. Koontz Creamery, Inc., Will's Dairy, Inc., and George C. Oursler.

John T. Chadwell, James E. Hastings, David L. Aufderstrasse and Richard E. Wiley, Chicago, Ill., J. Cookman Boyd, Jr., Baltimore, Md., for National Dairy Products Corp., and for John M. Lescure.

Ambler H. Moss and David R. Owen, Baltimore, Md., for Green Spring Dairy, Inc.

Z. Townsend Parks and H. Emslie Parks, Baltimore, Md., for William S. Hebb.

G. C. A. Anderson and Ward B. Coe, Jr., Baltimore, Md., for James J. Ward, Jr.

WATKINS, District Judge.

Certain of the captioned defendants, having pleaded that they were twice placed in jeopardy by the indictment herein, moved for a separate hearing of their motion to dismiss the indictment, before the court without a jury, prior to the trial of the general issue. After hearing, the motion was granted. United States v. H. E. Koontz Creamery, Inc. et al., D.Md.1964, 232 F.Supp. 312. Thereafter, an evidentiary hearing was held, pre- and post-trial briefs were filed, and the case was fully argued. While the moving parties were adequately identified in the opinion in 232 F.Supp. 312, a more detailed statement [1] of their relationships to the present and prior criminal proceedings is required.

*Statement of the Case*

On March 22, 1961 the United States filed a three-count indictment against:

Aristocrat Dairy
Cloverland Farms Dairy, Incorporated
Green Spring Dairy, Incorporated
The H. E. Koontz Creamery, Incorporated
Milk Distributors Association, Incorporated
National Dairy Products Corporation
Will's Dairy, Incorporated
John M. Lescure
George C. Oursler
Maurice M. Thomas
James J. Ward, Jr.

On July 17, 1961, the United States substituted an information for the indictment. It amended the information on January 12, 1962. That case, Criminal Action No. 25658 in this court, in the first count charged Aristocrat, Cloverland, Green Spring, Koontz, Milk Distributors Association (hereinafter "MDA"), National Dairy (hereinafter sometimes "Sealtest"), and Will's Dairy with violations of Section 1 of the Sherman Act by engaging in a conspiracy to allocate Baltimore City school milk contracts from 1946 to the fall of 1957. In the second count it charged all of the defendants with having conspired to allocate Baltimore City and Baltimore County school milk contracts in the school year 1959–1960.

[1.] The court has drawn freely on the excellent "Statement of the Case" appearing in the Government's "Post-Hearing Brief on Double Jeopardy" (hereafter Gov't. P-H), pages 1–7.

A third count charged individual defendants Lescure, Oursler, Thomas, and Ward, Jr., with violating Section 14 of the Clayton Act by authorizing or doing the acts alleged in the second count, in their capacity as corporate officers. On January 12, 1962, this court ordered the dismissal of the above-named individual defendants from the second count of the information, pursuant to an opinion filed on December 29, 1961. United States v. Milk Distributors Association, Inc., D.Md.1961, 200 F.Supp. 792. On February 23, 1962, the court accepted and ordered the entry of pleas of *nolo contendere* for all defendants and fined each of them.

Thus, Aristocrat, Cloverland, Green Spring, Koontz, MDA, National Dairy, and Will's Dairy stand convicted of Counts I and II of the information in Criminal No. 25658 in this court. Individual defendants Lescure, Oursler, Thomas, and Ward, Jr., stand convicted of Count III only.

These are the convictions that, according to those defendants in the present case who have moved for dismissal on that ground, raise the bar of former jeopardy.

On the 20th of December, 1962, the Grand Jury returned the Indictment in this case, Criminal No. 26128, against:

Cloverland Farms Dairy, Incorporated
Green Spring Dairy, Incorporated
High's of Baltimore, Incorporated
The H. E. Koontz Creamery, Incorporated
Milk Distributors Association, Incorporated
National Dairy Products Corporation
Royal Farms Dairy, Incorporated
Will's Dairy, Incorporated
Wilton Farm Dairy, Incorporated
William Sears Hebb (Aristocrat Dairy)
John M. Lescure
George C. Oursler
Clyde Shugart
C. Y. Stephens
James J. Ward, Jr.
James J. Ward, Sr.

This indictment, in a single count, charges a continuing conspiracy to fix the prices at which milk and milk products would be sold to the regular retail and wholesale trade (other than to institutional customers purchasing by competitive bidding) in the Baltimore area from 1956 to 1960. It is this indictment that certain of defendants claim charges them again with the commission of the same offenses for which this court formerly convicted them on their pleas of nolo contendere.

Of the defendants listed just above, C. Y. Stephens has died and the case has been dismissed as to him. Wilton Farm has pleaded guilty. Defendants High's, Shugart, and Ward, Sr. were not charged in the school allocation case and of course have not joined in the double jeopardy dismissal motion. Defendants MDA and Royal Farms have not joined in the double jeopardy motion and Cloverland has withdrawn from it, although each pleaded *nolo contendere* in the school allocation case.

Those moving for dismissal on grounds of double jeopardy are corporate defendants Green Spring, Koontz, National Dairy, and Will's Dairy, and individual defendants Hebb, Lescure, Oursler, and Ward, Jr. Of these, Green Spring, Koontz, National Dairy, and Will's Dairy were convicted under Counts I and II in the school allocation case. These corporate defendants are the same persons as those who, under those names, pleaded *nolo contendere* and were fined in Criminal Case No. 25658 in this court on two counts of violating Section 1 of the Sherman Act.

Defendant Hebb was not charged as an individual in the school allocation case. Aristocrat Dairy was so charged, however, and suffered conviction and fine under Counts I and II. Aristocrat Dairy is a partnership and Mr. Hebb is its principal partner. For the purposes of this motion, the Government is willing to have the court consider William Sears Hebb and Aristocrat Dairy as one and the same person and consequently to consider that Hebb was convicted and

fined in Criminal Case No. 25658 in this court for participation in the conspiracies alleged in Counts I and II therein.

Defendants Lescure, Oursler, and Ward, Jr., pleaded *nolo contendere* in the school allocation case to charges of violating Section 14 of the Clayton Act. Their charged offenses were, as corporate officials, authorizing, ordering, or doing the acts making up or effecting the conspiracy alleged in Count II of the Information in that case. For the purposes of this motion, the Government is willing that the convictions of John M. Lescure, George C. Oursler, and James J. Ward, Jr. under Count III of the Information in Criminal Case No. 25658 in this court, for a violation of Section 14 of the Clayton Act, be taken to have been convictions for violating Section 1 of the Sherman Act in the way and under the circumstances alleged in Count II of the amended information in that case. These named individuals are charged with violating Section 1 of the Sherman Act in this case.

In summary: In United States v. Milk Distributors Association, Inc., et al., Criminal No. 25658, the following movants were convicted of the counts appearing next their names:

Green Spring Dairy, Inc., Counts I and II;
William Sears Hebb, Counts I and II;
The H. E. Koontz Creamery, Inc., Counts I and II;
John M. Lescure, Count II;
National Dairy Products Corporation, Counts I and II;
George C. Oursler, Count II;
James J. Ward, Jr., Count II;
Will's Dairy, Inc., Counts I and II.

On July 19, 1963, the above defendants moved that the indictment in the present case be dismissed on the ground that it charged them with the commission of an offense which they had already been convicted of committing. After argument this court concluded that defendants' motion raised fact issues that could not be resolved solely by inspection of the record in the two cases and that these fact issues should be tried to the court without a jury, before trying the case-in-chief. (232 F.Supp. 312). On July 7, 1965, the hearing on the double jeopardy motion commenced. It ended on July 23, 1965, following nine days of trial, nearly all of which were spent in examining witnesses.[2]

Both sides are in agreement that there is no real conflict in the pleadings, admissions, bills of particulars (the factual averments of which, it is agreed, are to be treated as true for the purpose of this motion) and testimony, but they differ materially as to the inferences to be drawn therefrom, and therefore as to the legal consequences thereof. Likewise both sides are in agreement that the burden upon the moving defendants is to prove the existence of double jeopardy by a preponderance of the evidence.[3] Here agreement substantially ends.

Apart from the obvious disagreement as to whether or not moving defendants met their burden, there are important differences between the parties as to what defendants have to prove, and how they may be permitted to proceed in endeavoring to offer proof.

The Government contends that the "evidence does not sustain what *seems* to be movants' contention that what was

---

2. Briefs were filed by the middle of October, 1965 and the case was argued orally on November 22, 1965. Just as the court was about to start work on this opinion, the Government with laudable frankness indicated that it had failed to disclose to the moving defendants some of the material in the Government's possession relating to activities relied upon by the Government as evidence of conspiratorial ac-

tivities. The defendants advised the court that they did not consider this omission to be harmful, and did not desire further to brief or argue the case.

3. The Government, unnecessarily it is hoped, points out that a "doubt in favor of the defendants", or an even balance of the evidence, is not enough, Gov't. P–H, page 10.

involved was one over-all conspiracy to achieve market stability." [4]

"Defendants' theory of the motion and the plan according to which they offered evidence seems to have been not that the school bid-rigging conspiracies in some way forwarded or were organic subplots in the general price fixing conspiracy; nor vice versa. Rather their idea seems to have been that all of them flowed from a larger conspiracy in restraint of trade that included all trade restraint agreements defendants may have made." [5]

Defendants not unreasonably prefer to state their own position, which they do as follows: [6]

"The present indictment charges the crime the Government intends to prove against defendants. Defendants' only burden is to show by a preponderance of the evidence that the presently charged activity is not a separate conspiracy from school milk."

The Government further contends that:

"Having been convicted of two conspiracies in Criminal No. 25658 [school milk], movants are now foreclosed from attacking those judgments of conviction by urging that those two conspiracies were in fact parts of a larger conspiracy. Rather, they are bound by those judgments and can successfully plead double jeopardy only if those judgments cover the presently charged offense." [7]

Defendants in reply refer to an earlier memorandum filed on their behalf in response to a separate memorandum of the Government briefing this contention. In substance, defendants contend that their nolo contendere pleas preclude a factual determination thereon; that the pleas do not bar defendants from denying in this case, any fact that might arguably be drawn from Criminal No. 26568; and finally (and sufficiently, if correct, even

under the approach urged by the Government) that at least Count II of Criminal No. 26568 is sufficient to support the present double jeopardy motion.

This evidentiary point requires and will receive further extended consideration.

■■ Before finding the facts herein, and making conclusions of law, there is a matter of terminology that while usually only of footnote stature, is of such importance in this case as to require textual treatment. The case, and the current motion, relate to alleged conspiracies. It is obviously unnecessary to repeat this adjectival qualification each time. But more importantly, since this is a motion, any findings of the court are naturally based upon the current record, and are limited in effect to this motion. While any evidence (or certainly any testimony) offered by defendants on this motion could be used (at least for impeachment purposes) against them in a trial on the merits should they ultimately be unsuccessful on this motion, the court's findings and conclusions could not so be used. Particularly would this be true as to High's and its officers, who were not defendants in Criminal No. 25658; who could not join in this motion, even if they so desired; and who should not be prejudiced by anything that occurs, or is said, therein and herein.

### Findings of Fact.

From the entire record in this motion, the court makes the following findings of fact: [8]

#### Background of the Baltimore Milk Business

The nine Baltimore dairies involved in each of the two involved Sherman Act prosecutions, Criminal No. 25658 (school milk) and Criminal No. 26128

---

4. Gov't P–H., page 8. Emphasis supplied.

5. Gov't. P–H., page 12.

6. "Defendants' Post-Trial Reply—Double Jeopardy", pages 13–14.

7. Gov't. P–H., page 8.

8. The following 21 paragraphs are almost verbatim the factual statements contained in "Defendants' Post-Trial Memorandum —Double Jeopardy" (Defendants' P–T), pages 3–11. As previously indicated, there is no real disagreement on the facts.

(street milk), are: Koontz, Sealtest, Green Spring, Will's, Aristocrat (each a moving defendant herein), Cloverland, Royal, Kress and Wilton.[9] High's, another Baltimore dairy (which sells only from its own dairy stores), is a defendant in Criminal No. 26128 only. Each of these dairies was engaged in the milk business in the Baltimore area before and during the indictment period and together they accounted for substantially all of the milk business in Baltimore City and most of it in the surrounding metropolitan area. Penn Dairies, a defendant in Criminal No. 25658 only, is a Pennsylvania-based company with a branch in Aberdeen, Maryland which sells dairy products in the metropolitan area outside the city limits of Baltimore.

Milk Distributors Association ("MD-A") was a trade association organized in 1935 (DX 5A; Thomas, R.99). Practically all of the group meetings embodied in both cases were held under the auspices of and paid for by MDA; most of the meetings were at the Sheraton-Belvedere Hotel in Baltimore (Transcript February 9, 1963, pages 172–173, DX 2, 2A, 3, 3A, 44; Thomas, R. 98–106; Rexford, R. 632). MDA was made a defendant in both prosecutions.

Sales of fluid white milk, so far as the two cases are concerned, were made principally in half-pint, quart, and beginning in 1955 in Baltimore City, half-gallon containers. Milk in half-gallon glass bottles is referred to as "jug milk." High's required a twenty cent deposit on its half-gallon jugs; the other dairies specified either a five cent or twenty cent deposit at various times. The so-called "jug differential" is the difference between the price to home delivery customers and the price to store customers. To some extent, milk products such as chocolate milk, buttermilk, cottage

cheese, etc. have been involved in both cases. (Thomas, R. 329–334; O'Brien, R. 771–772; Williams, R. 801–802; Sheehan, R. 1187–1195; DX 45).

Unprocessed cow's milk was obtained by the Baltimore dairies either from independent producers or through the Maryland Cooperative Milk Producers' Association (sometimes "Co-op") or both. From time to time the Co-op changed the price of unprocessed milk to the dairies. Often this would follow meetings between officials of the Co-op and representatives of the dairies. (Thomas, R. 89–92, 107, 245–246, 257–261).

During the early 1950's Sealtest and Green Spring were the only union dairies. In 1955 Kress was unionized. In 1956 and 1958 two-year labor contracts were negotiated with the union as the result of joint bargaining sessions between the union on the one hand, and Kress, Sealtest and Green Spring on the other. The non-union dairies found it necessary to follow closely the wages and working conditions granted by the union dairies and in general met or bettered them. (Thomas, R. 85–88, 118; Sheehan, R. 1188).

### School Milk Prosecution

The school milk case was based upon charges of alleged price-fixing and elimination of competition as to school bid customers beginning sometime prior to 1946. This involved a dividing up of the school bid business by school district among the participating dairies, and an agreement on a "break price." A dairy to which a district was allocated bid below the break price and the others bid above. Beginning with 1950 a "dropout" plan was initiated. Under the dropout plan only Sealtest and Cloverland were allocated at least one district each year. Aristocrat, although not allocated a district every year, refused to drop out and

---

but "just" on the inferences (Transcript [R.] 1292). The court has endeavored to reflect in the findings the "flavor" of the Government's treatment thereof. Full consideration is then given to the effect of the Penn Dairies and High's participations.

9. Kress was named as a co-conspirator in counts I and II of the school milk case but was not charged as a defendant. Its stock was acquired by Koontz and it merged into Koontz in June of 1960. Wilton was named as a co-conspirator in count II of the school milk case but was not charged as a defendant in that case.

so had a district in each year the allocations were effective. One of the other dairies in each such year was not given a district, and thus "dropped out." (Thomas, R. 129–130, 154–155, 459–462; Fisher, R. 567–568; Morris, R. 597, 607–608; Hatton, R. 743–744; Lazenby, R. 871; DX 42; GX 12).

The group making the allocations was unable to work them out for the bids which were made in the summer of 1958, and Sealtest took the entirety of the school milk business. However, in 1959, there was a return to allocation and break price; the arrangements were expanded to include the Baltimore County schools; and Penn Dairies became a participant (Thomas, R. 177, 206–207; Crocker, R. 986–990).

Defendants in the school milk case were convicted and fined on their pleas of *nolo contendere* to the counts under which each was charged.

### The General Milk Prosecution

The present case revolves around the activities of the same MDA sponsored group at the Belvedere, during substantially the same time period as the school milk activity. It also is based upon charges of price-fixing and elimination of competition in "the sale of milk and milk products to wholesale customers and retail home delivery customers in the Baltimore Metropolitan area (other than sales to institutional customers purchasing by competitive bidding)"; the parenthetical qualification being the pleader's effort to exclude school milk (Indict-Paras. 10–12).

### Intercompany Activity Prior to 1956

For many years the Milk Distributors Association sponsored meetings of representatives of the Baltimore dairies. This group, over the years, discussed and acted upon a variety of matters affecting the Baltimore market. These matters included the question of eliminating so-called "unethical practices"; discussing the changes and cost increases resulting from new labor contracts; matters relating to changes in the cost of raw milk;

discounts; the effect of the foregoing on milk prices; school milk allocations and break price, and other matters of interest. These activities were inextricably interwoven under MDA supervision for a number of years (Thomas, R. 98–100, 222–223; Fisher, R. 565–569; Morris, R. 591–593; Rexford, R. 630; Hatton, R. 740, 743–744; Williams, R. 799–800; Lazenby, R. 870).

The group which engaged in these activities changed little. Wendall Baker of Cloverland, F. M. Lazenby and Maurice Thomas of Kress, William Williams of Will's, W. S. Hebb of Aristocrat, and Roland Zaiser (the latter two as alleged absentee participants) were active from the beginning in the 1930's down to the end. Other participants, active in the earlier years, such as Cuddeback of Sealtest, Oursler, Sr. of Koontz, and Parks of Green Spring, who died or resigned, were succeeded by Lescure, Finnesey, Morris, Oursler, Jr., Fisher, and Rexford. Sealtest, the largest of the dairies, sometimes had different representatives for different subjects, but, for the most part, the representatives of the other dairies were active in all of the meetings and discussions. (Thomas, R. 109–110, 148–149; Fisher, R. 565, 570–572; Morris, R. 591–592; Rexford, R. 627–628, 633; Hatton, R. 740, 745; Williams, R. 799–801).

By the 1950's the group was holding practically all of its meetings at the Belvedere Hotel (Thomas, R. 100; Fisher, R. 565; Rexford, R. 628). Memories are vague on specific details of the meetings and activities prior to 1950, but there appears to be no dispute that the school milk allocations began at least during World War II (Thomas, R. 128) and that the other activities were contemporaneous (or as the Government contended, they went as far back as N.R.A., Tr. April 15, 1963, page 145). In 1950 the dropout plan began and Green Spring was the first to drop out (DX 42; GX 12; Fisher, R. 567). The same MDA group acted on the dropout and break price in 1950 and also on the other matters (Fisher, R. 565–567). Meetings

of the group were on a more or less regular basis (Rexford, R. 627–628; Hatton, R. 740–741).

### 1956–1960

In 1956 Rexford became president of the MDA and the meetings were placed upon an "on call" basis, but the same general line of activities described above continued for the next several years (Thomas, R. 105–106; Rexford, R. 628–629). That was the period encompassing both the school milk and general milk charges.

As in earlier years, the MDA continued its leading role in the group activity. The Second Supplementary Bill of Particulars in the general milk indictment (the Amended Information not having been particularized) alleged the participation of MDA and its officers in every series of group meetings, and only the MDA is alleged to have made any arrangements for such meetings (Second Supp. Partics. 2–20; DX 1 for Id.). Likewise, the Government has recognized that the MDA sponsored and paid for the meetings which were the focal point of the school milk charges (Tr. February 9, 1962, pages 172–173). DX 2, 2A, 3, 3A and 44 show that the MDA sponsored and paid for the meetings during the period. The meetings continued to cover the wide variety of subjects described above, and such additional items as dating of milk containers, State price control, entry into the jug business, jug deposits, jug differential, county school allocations, and non-raiding of wholesale accounts. Any meeting, even although called for a specific purpose, was wide open for the consideration of any number of these topics. (Thomas, R. 101–110, 522; Morris, R. 592–594; Rexford, R. 630, 634, 636, 656, 688–689; Williams, R. 800–801; Second Supplementary Partics. 2–20)

The same group or "clique" continued to direct the discussions and activities. Certain matters such as school bids and labor contract changes, and to some extent Co-op prices, came up more or less regularly. Jug matters arose sporadically. The discount "rat-race" was fairly

constant. Some matters such as jug price drops and the Baltimore County school contract cancellations created a need for emergency meetings and action. (Thomas, R. 107–108, 515; Fisher, R. 570; Rexford, R. 634, 691; Morris, R. 594, 612).

The MDA ship encountered stormy seas in 1958 and 1959. During this time there was the spread of jugs and jug price wars together with dissatisfaction over the school allocations, and there may have been other factors. Early in 1958, one or more dairies arrayed themselves against the group on jug pricing and other jug matters. First, Cloverland and Royal were against the other dairies on the White Jug (R. 690). Will's bucked and eventually led the group by setting a five-cent deposit on jugs (Williams, R. 808, 819). High's declared war on the others on jug pricing (Rexford, R. 691–692; Sheehan, R. 1189). In the middle of the year it was Sealtest against the group on school bids (Thomas, R. 177–180). A truce was declared in the jug battle in December of 1958 (Second Supp. Partics. 12–14; Sheehan, R. 1191). The school damage, however, could not effectively be alleviated until the contracts were up for bid again in the summer of 1959. High's again fell out with the rest of the group, and Green Spring was also at odds with the main body over jug pricing (Thomas. R. 514–515; Rexford, R. 705–707, 711; Sheehan, R. 1193). Under command of the MDA group at the Belvedere the school, jug and other problems were overcome, and by the fall of 1959 things were reasonably serene (Second Supp. Partics., pages 17–18; Am. Inf. Count II).

As to the jug aspect, the Second Supplementary Particulars allege a number of phone calls, chance encounters and two or three meetings to pave the way for group action at the Belvedere (pages 11–12, 16–17; see also Rexford, R. 709–713; Williams, R. 820–825). The evidence shows similar ancillary activity away from the Belvedere in reactivating the school allocations (Thomas, R. 205–207; Crocker, R. 986–990).

While the main body of the Belvedere group remained the same down through the years (except for changes brought about by death or retirement), toward the end of the period encompassing both school milk and general milk activity two new threats to market stability in the Baltimore area arose. The first threat was High's which introduced jugs in Baltimore in 1955 (Sheehan, R. 1187). By 1958, when the other dairies went into the jug business, the friction began to rise (Thomas, R. 329–332, 363; Sheehan, R. 1188–1192). This had an impact on the other dairies' retail business (Thomas, R. 363). In 1958 and 1959 the jug market became chaotic. There were price drops, changes in deposit and changes in the differential between retail and wholesale (Thomas, R. 171, 383; Rexford, R. 690–693; Williams, R. 808, 819–825; Lazenby, R. 873; Sheehan, R. 1188–1189, 1193).

This brought about a number of meetings and discussions focused at the Belvedere but some also were held elsewhere. Some discussions were by telephone. The court finds on the record, for the purposes of this motion only, and without prejudice to High's position in any future proceedings, that the entry of High's into concerted action with the Belvedere group contributed to the overall market stability in the Baltimore area by terminating the price war, by smoothing out the deposit problem which had plagued the dairies since they entered the jug business, and by establishing an acceptable allocation of business between wholesale and retail jugs by determining a differential between the wholesale and retail home delivered jug price (Second Supp. Partics. 11–18). The Government's particulars and evidence show that High's knew when it joined the Belvedere group that its activities included school allocations (Sheehan, R. 1214–1215), as well as street milk and jug milk activities (Second Supp. Partics. 22).

When the county schools in Baltimore County were all placed on a bid system in 1959 (O'Brien, R. 783; Willis, R. 940), the Baltimore dairies were afforded an opportunity to effect a more acceptable allocation on school business. But it also created a threat to stability because Penn Dairies was interested in obtaining County school business. Penn, while not licensed to do business in Baltimore City, was a factor in Baltimore County (Thomas, R. 360; Payler, R. 1022, 1046; Morgan, R. 1063–1064).

Since Penn, for the most part, was content to follow the Baltimore dairies' pricing in the County, this threat to stability could be resolved by including Penn in the Baltimore County allocations. This was done without Penn attending any meetings of the Belvedere group. Its participation was arranged by telephone. Payler, a Government witness and general sales manager of Penn, admitted that he knew there were dealer meetings going on, that they included City school allocations and that he did not know to what extent they went beyond school allocations (Payler, R. 1025–1031, 1037–1039, 1047, 1053; Morgan, R. 1079–1081). Payler, along with Hatton, also testified that several years prior thereto he had been visited in Lancaster, Pennsylvania by a delegation of representatives of the Baltimore milk dealers, who in fact were some of the principal members of the Belvedere-MDA group (Hatton, R. 746–750; Payler, R. 1037, 1053–1057). The purpose of the visit was to "acquaint" Penn with the Baltimore market (Hatton, R. 748).

There is substantial identity between the defendants in the school milk and street milk cases. Thirteen defendants and co-conspirators were named and prosecuted in the school milk case. Eleven of these defendants and co-conspirators were re-indicted or named in the street milk indictment. A twelfth, Maurice Thomas, received immunity and was not indicted in the street milk case, although his role in the school and street milk activities was relatively the same. The most significant differences, to which individual attention will later be given, are the inclusion of Penn Dairies in Count II of the school milk Amended Information, but its exclusion from the in-

dictment in this case; and the inclusion of High's (and several of its officers) in this case, but not in any of the counts of the school milk Amended Information.

However, variance between defendants in two cases is not necessarily inconsistent with the existence of a single conspiracy. Short v. United States, 4 Cir. 1937, 91 F.2d 614; United States v. Cohen, 3 Cir. 1952, 197 F.2d 26; United States v. United States Gypsum Co., D.C. D.C.1943, 51 F.Supp. 613; United States v. Corn Products Co., S.D.Calif.1964, Criminal No. 30937; United States v. National Cheese Institute, N.D.Ill.1950, Criminal No. 33197.

The moving defendants met or were represented at meetings at the same principal place; under the auspices of MDA; the meetings were called and conducted in the same way, and outside activities were relatively the same whether the principal or stated purpose was school bids, labor costs, the price of raw milk from Co-op or independents; jugs, jug pricing and deposits, or other matters of interest. Specifically, each of the individual school milk defendants, and Maurice Thomas, were present or represented at all of these meetings at which school milk was discussed.

In addition to the school milk defendants and co-conspirators named in the school milk case, there were other regular participants in school milk. These were: Wendall Baker of Cloverland and Royal; Rexford of Green Spring; Finnesey and Oursler, Sr. of Koontz; Williams and Sale of Will's; and Zaiser of Wilton Farms. The record shows that each of these had similar participation in both general and school milk (Second Supp. Partics. 3–20; DX 1 for Id.; Thomas, R. 109, 148–149; Fisher, R. 565; Morris, R. 591; Rexford, R. 633, 684; Hatton, R. 745; Williams, R. 799–801).

The record further shows that there were certain occasional participants in both school milk and general milk. These were: Robert Baker, Maynard Kemp, Ralph Kemp, of Cloverland and Royal; Fisher of Green Spring; Morris of Koontz; Lazenby of Kress; Hatton and Mitchell of Sealtest (Second Supp. Partics. 3–20; DX 1 for Id.; Thomas, R. 110, 204, 254–256; Morris, R. 592; Rexford, R. 633; Williams, R. 799–801).

### Discussion and Applicable Law.

■■ A conspiracy is a "partnership in criminal purposes" enduring until the partnership is terminated. United States v. Kissel, 1910, 218 U.S. 601, 608, 31 S.Ct. 124, 54 L.Ed. 1168. If there be a common, continuing objective of the parties, there is a single offense, despite the existence of diverse ways and means used to accomplish it. Braverman v. United States, 1942, 317 U.S. 49, 52–54, 63 S.Ct. 99, 87 L.Ed. 23; Short v. United States, 4 Cir. 1937, 91 F.2d 614, 617–618; United States v. Swift, D.C.Ill.1911, 188 F. 92, 97.

■ The purpose of the defendants, conspiratorial or not, was to maintain market price stability in the Baltimore milk market. This involved prices to customers—wholesale (including schools and institutions); retail; and in particular quantities and forms—jugs; and as an incident, at least in school milk, the allocation of territory. Sometimes one of these was more important or more difficult than another; and sometimes the efforts to maintain market price stability were only partially successful. It seems clear to the court, and it so finds, that the purpose of maintaining market price stability was shared by the moving defendants during all the times in question; and that actions with respect to school milk, street milk, and jug milk were actions designed to control certain aspects of distribution, all of which were facets of, or factors in, the overall price structure.

While the Government has tried to carve out periods of two school milk conspiracies, the record makes it clear that by the end of World War II, there had developed a pattern of action in the Baltimore Metropolitan area with respect to school business; labor contract negotiations; producer cost and sales price increases, trade practices, and other com-

mon problems, which continued into 1960. (Thomas, R. 127–129; 222–223; Fisher, R. 564; Hatton, R. 741–744).

█ Time elements alone do not justify fragmentation. United States v. Cohen, 3 Cir. 1952, 197 F.2d 26, 29; United States v. Weiss, N.D.Ill.1923, 293 F. 992, 993; Powe v. United States, 5 Cir. 1926, 11 F.2d 598, 599; United States v. McGee, D.Wyo.1953, 117 F.Supp. 27; United States v. National Cheese Institute, N.D. Ill.1950, Criminal No. 33197.

The Amended Information in Criminal No. 26568 and the Indictment herein, although attempting to distinguish between school milk and other milk, recognize that the "trade and commerce" involved were substantially the same; an annual dollar volume of approximately $50,000,000 for the period 1956–1960; the annual quantity handled being in excess of 500,000,000 pounds; and payments to producers and others for raw milk averaging approximately $25,000,000 per year (Amended Information, paragraph 7, 19(b); Indictment, paragraph 6).

Each charges "a combination and conspiracy to suppress and eliminate competition in the sale of milk * * *"; in the Amended Information, for use in public schools (paragraphs 10, 11, 22, 23); in the Indictment, "to wholesale customers and retail home delivery customers in the Baltimore Metropolitan area (other than sales to industrial customers purchasing by competitive bidding)" (paragraphs 10, 11).

Against all this, the Government makes several arguments, primarily by way of supporting its contentions that there were two school milk conspiracies, and a separate one as to street milk.

First, it is argued that "the conduct the bill of indictment alleges against the defendants embodies a simple scheme to fix prices by agreeing upon them in advance of posting them and then following them * * * to keep and maintain the prevailing price of milk at a noncompetitive level, fixed by them by agreement." [10]

Just what this purports to prove is not clear to the court. The simplicity, if that be the proper characterization, of the scheme, is consistent with any scope. Further, school milk is milk; it had a market price. It would seem to be encompassed in any scheme "to keep and maintain the prevailing price of milk at a noncompetitive level, fixed by them by agreement."

Secondly, the Government contends that there was no relationship between the fixing of school bids and allocations, and the plot to fix the price of milk at wholesale and retail.[11] But school milk is milk; the price received for it necessarily affects the amount of milk distributed, and the amounts received therefor, just as does the fixing of (other) wholesale and retail prices. This inevitable relationship is clearly recognized in the Government's Post-Hearing Brief. Two instances are quoted, not to show the inconsistencies of the Government's position, but because of the inherent logic in the statements:

"They [the distributors] were not, on the other hand, willing to face the risk that sudden changes in costs might produce destructive price dislocation situations that would cause price wars or force them to absorb increases that would narrow profit margins, *so they fixed street prices*. They were not willing to accept the risk of wide fluctuations in plant volume that competitive bidding entailed, *so they rigged the school bids*. It is those narrow and explicit objectives which are supported by the testimony. * * *"[12]

\* \* \* \* \* \*

10. Gov't. P–H., pages 10–11. It may be questioned if this is an accurate summary of paragraphs 10 and 11 of the Indictment; but in view of the conclusions hereinafter stated by the court it is not necessary to press this question.

11. Gov't. P–H., page 12.

12. Gov't P–H., page 12—emphasis supplied.

"School business was an area in which cooperation could seem beneficial. Bidding narrowed to price alone the strategies legitimately available for getting it. Other factors right, any dairy might hope to win any given bid, but the range of prices competition was likely to produce was narrow enough that a small difference in price might bring a dairy far more business than it could efficiently handle (Thomas, Tr. 466). Moreover, the cost calculations on which a competitive bid depended contained assumptions about volume of milk processed, over-all volume of half-pint containers processed and volume of school milk obtained (Crocker, Tr. 994–995). It was easy to miscalculate. No dairy, not even Sealtest as it turned out, could handle [all] the school business profitably (Crocker, Tr. 994–995). For reasons of plant economy alone, some school business was good to have, but was best to have was neither too much nor too little and in a roughly predictable quantity. Allocating the school business made good commercial sense. The evidence is clear that this is what the dairymen did (Thomas, Tr. 127–131; Rexford, Tr. 665; Payler, Tr. 1070; Williams, Tr. 802–803).

"*A similar account, in terms of harmonizable objectives and shared goals* explains the wholesale and retail price-fixing conspiracy. Dealers win little of substance from a price war. The advantages of lowering prices are short lived, the disadvantages of a price war are obvious (Thomas, Tr. 94). The solution, of course, is to avoid price wars by moving together when cost factors make some kind of price change necessary." [13]

A striking admission that school bids and street prices were discussed and agreed upon at the MDA meetings, and accepted by the distributors, is also found in the Government's Post-Hearing Brief:

"Neither Wilton Farm Dairy nor Aristocrat Dairy even came to the meetings, apparently confident that all that would be produced that interested them were periodic agreements on how to cut up the school business, or how much, if at all, to increase prices as costs increased (Morris, Tr. 603–609; Thomas, Tr. 146–149; Rexford, Tr. 684–685)." [14]

Thirdly, the Government argues that the participation by Penn Dairies in the activities attacked in Count II of the Amended Information but not in Count I thereof nor in the current Indictment and the participation of High's in the activities attacked in the current Indictment but not in the Amended Information, necessarily means that different conspiracies must have existed.

a. Penn Dairies.

In 1959 Baltimore County Schools were all placed on a bid system (O'Brien, R. 783; Willis, R. 940). While this gave the Baltimore distributors an opportunity to revamp the whole allocation system on school business, a complication arose through the interest of Penn Dairies in Baltimore County School business. Penn was not licensed to do business in Baltimore City, but was active in Baltimore County, wholesale, retail and half-gallons; and had served some Baltimore County schools (Thomas, R. 360; Payler, R. 1022, 1046; Morgan, R. 1063–1064).

Although not up to that time in active collaboration with the Baltimore distributors as to milk prices in Baltimore County, Penn generally knew a few days in advance of proposed general price increases, through newspaper articles, advertisements, and from the routemen. When the information was specific as to date and prices, Penn would usually put up its prices at the same time, otherwise there might be a short lag (Morgan, R. 1080–1081, 1092). When the County

---

13. Gov't. P–H., pages 45–46—emphasis supplied.

14. Gov't. P–H., page 19; and see pages 40–41.

school milk business was put on bids, Penn was interested in Area VII and nothing else, and Thomas knew this. Penn expected to be, and was, the successful bidder on Area VII. The arrangements were by telephone; Penn's representatives never attended an MDA meeting (Hatton, R. 745; Payler, R. 1046, 1048).

Penn's general sales manager knew that dealer meetings of the Baltimore distributors were going on and that they included City school allocations, but he did not know to what extent they went beyond school allocations (Payler, R. 1025–1031; 1037–1039; 1047, 1053; Morgan, R. 1079–1081). He had received a telephone call from Thomas with respect to conditions generally in the dairy business (Payler, R. 1048). Several years before, Payler had been visited in Lancaster, Pennsylvania by a delegation of representatives of the Baltimore milk distributors, who in fact were some of the principal members of the MDA group (Hatton, R. 746–750; Payler, R. 1037, 1053–1057). The purpose of the visit was to "acquaint" Penn with the Baltimore Metropolitan market (Hatton, R. 748).

Much argument centered around the meaning and applicability of Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, particularly with respect to Penn and High's. That case, however, is no authority on the subject of what constitutes a single continuing conspiracy and what constitutes a conglomeration of distinct and separate offenses,[15] the prosecution and defense in that case agreeing that the evidence showed multiple conspiracies. Whatever Penn may or may not have known about any general agreement as to street milk, it certainly knew that school milk price and allocation agreements would involve schools in both Baltimore City and Baltimore County. Although Penn could not sell in Baltimore City, the Government does not attempt to fragment the 1959

school agreement into two conspiracies, and charge all but Penn with conspiracy as to Baltimore City schools, and all, including Penn, with a separate Baltimore County school conspiracy. The Government instead claims that "the pre-1958 school conspiracy was identical in nature with the 1959 school conspiracy * * *";[16] which nature was not changed by the addition of a new partner to eliminate the new threat of a truly competitive bid. Although not named in the current indictment, since it was alleged in the earlier Amended Information that Penn knew it had joined a conspiracy, and since it appears that Penn knew it was aiding a plan larger than one involving Baltimore County schools only, it could be charged with whatever was done pursuant to an overall conspiracy, whether or not it knew or had reason to know its full content and extent. Blumenthal v. United States, 1947, 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154; Pinkerton v. United States, 1946, 328 U.S. 640, 646–647, 66 S.Ct. 1180, 90 L.Ed. 1489; United States v. Sansone, 2 Cir. 1956, 231 F.2d 887, 893, cert. den. 1956, 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500.

The failure to indict Penn is therefore no more inconsistent with the existence of a general conspiracy than is the giving of immunity to, and failure to indict, Thomas.

b. High's.

In 1955 High's introduced jug milk into the Baltimore market in the form of one-half gallon jugs, sold directly to the retail public through outlets. The other distributors tried, at first primarily individually, to meet the threat. Problems of price and jug deposit resulted in a chaotic market in 1958–1959. At the end of January 1958, the defendants herein other than High's reached agreements on wholesale half-gallon jug milk. On or about December 1, 1958, High's and the other indicted defendants reached an agreement as to jug milk. At no time did

---

15. Government's Severance Memorandum, August 26, 1963, page 11.

16. Gov't. P–H., page 43.

High's serve milk to schools, but at the time of the agreement with the other distributors, High's knew of the general price fixing activities of the other defendants herein, including the school milk allocations.

The December 1, 1958 agreement resulted from an early November 1958 MDA luncheon at the Belvedere, attended by High's and representatives of all of the other defendants herein.[17] As a result of this meeting it was agreed that all defendant distributors other than High's would raise their half-gallon prices and increase their deposits; and High's raised its prices on half-gallon jug milk, retaining its previous deposit price.

High's was still dissatisfied with the differential in price between the other defendant distributors' home delivered milk and its own store-sold milk. High's wished the differential to be seven or eight cents. To try to get such agreement, High's on June 6, 1959 lowered its prices to seven cents below existing home delivery prices. While most of the other distributors would have been willing to meet the seven cent differential desired by High's, Green Spring was adamant on a five cent differential, and the others followed this lead.[18]

On November 1, 1959, High's, pursuant to agreement with the other indicted distributors, raised its prices, and immediately thereafter the other defendant distributors raised their wholesale and retail home delivery, half-gallon, prices creating the differential of seven cents demanded by High's.[19]

The Government contends that the entry of High's "was a renewal of the earlier conspiracy with High's as a new member. At its end, [June 6, 1959] High's terminated it."[20] A somewhat

more nebulous approach is later taken by the Government, when it refers to "the continuing conspiracy that High's joined, or the dead conspiracy that High's blew life back into * * *"[21]

This short-phase aspect has several weaknesses. Part of the December 1958 agreement was the increase of the jug deposit to twenty cents. This deposit continued long after June 1959.

When High's, in its severance motion, argued that at the most it was charged with a separate short term conspiracy, the Government argued that the dropping of prices after the jug deposit agreement did not mark the end of High's participation in the conspiracy;[22] insisted that High's participated in the entire conspiracy; that the indictment so charged; and that there was no possibility that a Kotteakos-type situation existed.[23]

■ The court of course is not bound by consistencies or inconsistencies in the position of any of the parties, although these may be of significance in deciding which of possible conflicting inferences should be applied.

Significantly, however, the indictment charges that beginning some time prior to December 1, 1958 and continuing into the late fall of 1960, "High's joined the aforesaid combination and conspiracy and, thereafter, said combination and conspiracy encompassed the suppression and elimination of competition in the sale of half-gallon containers of milk to dairy store customers."[24]

c. Sealtest.

The Baltimore school milk allocation was not followed with complete consistency. One dairy which refused to accept its scheduled drop-outs was allowed to take more than its share for fear that if it did not, it would upset prices (Wil-

---

17. Second Supplementary Bill of Particulars, pages 12–13.

18. Second Supplementary Bill of Particulars, pages 13–15.

19. Second Supplementary Bill of Particulars, pages 17–18.

20. Gov't. P–H., page 27.

21. Gov't. P–H., page 42.

22. Transcript October 23, 1963, pages 105–106.

23. Transcript April 15, 1963, pages 107, 108.

24. Indictment, paragraph 10.

liams, R. 803–804; Morris, R. 597). However, the greatest disturbance occurred in 1958 when Sealtest (to its sorrow) refused to discuss break prices with the other distributors, and took over all the Baltimore school business. This was "corrected" at the 1959 bidding period, when Penn was admitted as to Baltimore County schools.

The Government relies principally upon the above three situations, but also upon other divergencies, in its contentions that a series of conspiracies existed separately and independently. The court however, upon the entire record, finds without hesitation that during all the times in question there existed an arrangement and agreement with respect to the maintenance of non-competitive milk prices in the Baltimore Metropolitan area. The types of milk distribution—street, school, jugs—were all parts or aspects, or factors of, and inextricably parts of, this overall design. It may be true that the course of a conspiracy, like that of true love, may not always run smoothly, and may be marked by "family squabbles." [25] Here, although the individual participants were not serfs, the overall purpose, under the aegis of MDA was continuous. If concessions had to be made to a single recalcitrant member, they were made. If a new member had to be brought in, it was (Penn as to Baltimore County schools; High's as to jug prices and deposits).

The single purpose—non-competitive milk prices in the Baltimore Metropolitan area—was continuous and pervasive; and the various agreements as to street, school and jug prices were merely devices or means to effect the overall end.[26]

[8] The court therefore finds as a fact, and concludes as a matter of law, that the things of which the moving defendants were convicted on their pleas of nolo contendere to the Amended Information were part of a general milk price-fixing agreement of which the current Indictment is an integral part; and that the Amended Information and the Indictment relate to facts and conduct that are part and parcel of an overall price-fixing agreement or arrangement.

In so doing the court has not been unmindful of two legal arguments of the Government as to the admissibility of evidence.

■ 1. In its simplest form, the Government has urged that some of the moving defendants have been convicted on their pleas of nolo contendere to the Amended Information, of two school milk conspiracies, and the remainder, as to a second school milk conspiracy. The argument then goes that evidence to show that the two school milk conspiracies were *in fact* part of a larger conspiracy is inadmissible, since it would be a collateral attack upon the validity of those judgments. (Somewhat inconsistently the Government also argues that "The issue is whether either *or both* of the former convictions are for the same offense the present indictment charges." [27]) The defendants argue that nolo contendere pleas preclude a factual adjudication; that the pleas do not bar defendants from denying any "fact" in another case; and that at least Count II of the Amended Information—the 1959 school milk conspiracy—is part of the same of-

---

25. Government's Severance Memorandum, August 26, 1963, page 6.

26. The court had the benefit of seeing and hearing testify many of the representatives of the corporate defendants. To none of them could the court ascribe the subtlety of saying, or thinking, that in their efforts to control prices of milk they were separately and independently at one time considering *only* "milk sold and delivered . . . in the Baltimore Metropolitan area *other than institutional customers purchasing by competitive bid-*

ding"; and at the same meeting separately and independently considering price fixing *only* as to "institutional customers purchasing by competitive bidding."

The whole tenor of the testimony was that they were trying to make a living from the sale of milk, by avoiding crippling competition; and what from time to time was necessary to effect this, they did, or tried to do.

27. Gov't. P-H., page 52; emphasis supplied.

fense as that charged by the current Indictment.

Neither side cites, and the court has found no controlling decision on the position of the Government.

However syllogistically appealing the position of the Government may at first appear to be, a practical application seems to demonstrate that it is illogical. The Government admits that to show double jeopardy, the defendants may properly try to prove that either the first school milk conspiracy *or* the second school milk conspiracy is the same offense that the present indictment charges; but insists that the defendants may not be permitted even to offer evidence that both school milk conspiracies are the same offense that the present indictment charges. That is, the defendants may offer evidence that A is the same offense as B; and that C is the same offense as B; but not that A and C are the same offenses as B.

An irreconcilable anomaly is presented. Assume three defendants plead double jeopardy. One may offer evidence that the first school milk conspiracy is the same offense that the present indictment charges; one may offer similar evidence as to the second school conspiracy. Presumably the court may find for each— that the first school conspiracy as to one defendant, and the second school conspiracy *as to a second defendant*, are *each* the same offenses that is charged in the current indictment; but the third defendant may not offer this same evidence, or any evidence, to show that *both* are the same offense charged in the current indictment.

The court has found that, however pleaded by the Government, and despite the pleas of nolo contendere, the offenses charged in Counts I and II of the Amended Information are the same offenses as that charged in the Indictment—being merely details of overt acts in the performance of the same conspiracy.

Should any other court be inclined to feel there is merit to the Government's contention, this court further specifically finds as a fact and concludes as a matter of law that the offense charged in Count II of the Amended Information is the same offense charged in the Indictment.

2. In the course of the trial the court suggested that the conduct of the moving defendants might arguably not be conspiratorial, but merely either conscious parallelism, or a similar reaction to the impact of similar economic forces. The Government contends that if no conspiracy in fact existed there could not be an identity of conspiracies, and therefore double jeopardy would not be a valid defense. But this would mean that double jeopardy is available only to the guilty, not to the innocent. In United States v. Corn Products Co., S.D. Cal.1964, Criminal No. 30937 and United States v. National Cheese Institute, N.D. Ill.1950, Criminal No. 33177, the defendants were acquitted of the first charge, but successfully pleaded double jeopardy to the second charge. As this court pointed out in United States v. H. E. Koontz Creamery, Inc. et al., D.Md.1964, 232 F.Supp. 312, the purpose of the double jeopardy provision is to forbid another trial of defendants for the same offense.

The motions of the moving defendants are granted, and the Clerk is directed to enter a dismissal of the Indictment herein as to them on the ground that to require them to stand trial herein would place them in double jeopardy.